1997–NMCA–006

932 P.2d 499

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Terri HERNANDEZ, Defendant–
Appellant.**

No. 16489.

Court of Appeals of New Mexico.

Dec. 23, 1996.

Tom Udall, Attorney General, Marcia J. Milner, Assistant Attorney General, Santa Fe, for Appellee.

Monica D. Munoz, Albuquerque, for Appellant.

## OPINION

ARMIJO, Judge.

1. Defendant appeals her conviction on one count of possession of cocaine and one count of conspiracy to traffic cocaine by possession with intent to distribute. On appeal, Defendant raises the following issues: (1) whether the trial court erred by denying her motion to suppress evidence; (2) whether sufficient evidence existed to support her conviction; and (3) whether she was deprived of effective assistance of counsel because trial counsel failed to move to suppress statements made in response to custodial interrogation when she had not been advised of her rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. We reverse Defendant's conviction on both counts and remand for a new trial consistent with this opinion.

## I. FACTUAL BACKGROUND

3. On March 4, 1994, Terri Hernandez (Defendant), her nineteen-year-old daughter, Yvette, and Yvette's infant daughter were returning from Ciudad Juarez, Mexico, to their home in Dexter, New Mexico. Defendant testified that she and her daughter drove to Ciudad Juarez to shop for wedding clothes. Defendant was the driver of the vehicle, which she owned. At the Border Patrol station in Oro Grande, New Mexico the vehicle was stopped for a short, routine citizenship check. The occupants of the vehicle exhibited no suspicious behavior or conduct and the vehicle was allowed to pass through the checkpoint. A blue pick-up truck driven by Jose Ibarra appeared at the checkpoint a few vehicles behind that of Defendant. Defendant testified that this pass-through occurred at about 1:20 p.m. and the State contended that the pass-through occurred at about 1:45 p.m. Within minutes thereafter and almost contemporaneous with the pass-through, FBI Agent Jose Garcia conveyed information to Border Patrol Agent John Esquivel, then on duty at the checkpoint, that a confidential informant had advised him that a person named Terri Hernandez might be travelling through Otero County with an unspecified amount of cocaine on her person or in her vehicle. The confidential informant provided the make, color, and license plate of Defendant's vehicle and indicated that it would be followed by a blue pick-up. The source also provided the make and license plate number of the truck. The informant stated that he believed Defendant was in El Paso, from which Agent Garcia "deduced" that Defendant would be coming through the Oro Grande checkpoint. Agent Garcia did not investigate an alternative route through Carlsbad.

4. Upon hearing this information, Border Patrol agents stopped the blue pick-up as it passed through the checkpoint, then pursued Defendant's vehicle as it traveled down the highway. With lights flashing and sirens sounding, the agents pulled Defendant's car to the side of the highway about one mile from the checkpoint and ordered her to return with them under escort. Defendant turned her car around and the agents escorted her back to the checkpoint. The blue pick-up driven by Ibarra was also detained at the checkpoint.

5. Upon Defendant's arrival at the checkpoint, the agents asked Defendant and Yvette to get out of Defendant's car and took them to a trailer for questioning. During his initial questioning, Agent Esquivel requested and received from Defendant consent to run a "sniffer" dog around Defendant's car. The dog did not alert. No drugs or drug paraphernalia were detected on the women or found about the vehicle. Defendant requested and was denied permission to leave the checkpoint.

6. Another law enforcement officer, Agent Trujillo, was summoned from Alamogordo, New Mexico, arrived at 2:30 p.m. and shortly thereafter asked Yvette to consent for a strip search. There were no female agents on the premises who could conduct the searches, so Agent Trujillo called to Alamogordo for a female agent to conduct the searches. A female agent testified that she received a call from Agent Trujillo at approximately 2:30 p.m., that she put gas in her car and then proceeded to drive to the Border Patrol checkpoint.

7. While waiting for the female agent to arrive, the Border Patrol agents searched Defendant's car and that of Ibarra. No evidence of drugs or drug related activities were found in either vehicle. The female agent testified that she arrived at the checkpoint at approximately 3:00 p.m. and at 3:10 p.m. she sought and received consent from Yvette and Defendant to conduct the body searches. The trial court found that Defendant and Yvette were detained for two hours while the female agent was summoned from Alamogordo.

8. When Defendant was finally searched, no drugs were found on her person. However, two packets of cocaine wrapped in electrical tape were found hidden inside Yvette's bra and underwear. Defendant denied knowledge of the drugs found on her daughter. Yvette stated that she did not tell her mother of her possession of the packets of cocaine. When the agents informed Defendant that they were going to arrest Yvette, Defendant insisted that the agents arrest her, instead. According to Agent Sanchez, Defendant told him, "she [Yvette] was forced to do it. Please arrest me. I will take the blame for it. Please let her go." Defendant testified that she told the agents, "No, let it be me, not her [Yvette]. I mean, take me in. She's got a baby. This baby needs her mother more than anything else." When asked why she insisted on being arrested, Defendant stated, "That's my child and I want to take care of my daughter at any expense." Defendant further explained at trial that she believed Yvette was "forced" to carry the drugs because Yvette has a learning disability and is very easily influenced by others. The agents arrested both Defendant and her daughter. Yvette had no money in her possession; Defendant had very little money in her possession. Yvette testified that she received the drugs in El Paso as she waited in the vehicle while her mother shopped inside a store.

9. During questioning at the checkpoint, Defendant initially denied knowing the man in the blue pick-up truck, Jose Ibarra. She later stated that she did know him but that she did not see him when she first arrived at the checkpoint and had not seen him since she had "broken-up with him" several months before. Inside her vehicle, some mail bearing Ibarra's name was found, and Ibarra had a picture of Yvette's baby in his wallet. Defendant's statements relating to her denial of knowledge of Ibarra were related at trial by the State's witness. The State used these statements to impeach her credibility. It is uncontroverted that Defendant had not been read her *Miranda* rights prior to her being questioned about Ibarra. Defense counsel did not move to suppress the statements which Defendant made concerning her knowledge or lack of knowledge of

Ibarra, and it is this omission that forms the basis of Defendant's claim of ineffective assistance of counsel.

10. Ibarra was not arrested or charged.

11. Before trial, Yvette was found incompetent to stand trial because of an unspecified developmental disability which prevented her from abstracting concepts from concrete information.

12. Though not well focused at trial, Defendant presented a defense that, because of her "retardation," Yvette was easily influenced by persons (other than Defendant) to accept and conceal drugs for transport. Defendant testified that Yvette was a senior in high school, was enrolled in special education classes, and was easily led into trouble. Defendant also testified that Yvette had a history of skipping school and shoplifting when her friends asked her to do so. No expert testimony describing Yvette as "mentally retarded" or developmentally disabled was tendered, although the trial court did take judicial notice of the finding that Yvette had been found incompetent to stand trial. Although defense counsel argued that "someone took advantage of Yvette's mental age," he tendered no evidence as to Yvette's mental age nor did he tender any evidence of her low I.Q.

13. The only effort made by the defense to attempt such a tender was a motion for the district court to take judicial notice of the proceeding in which Yvette was found incompetent to stand trial. The motion was not objected to and the court, in response to this request, noted on the record:

> On September 29, 1994, I found that Yvette Hernandez was incompetent to stand trial in that she could not assist her attorney in the defense of her case. And further, I found that she could not receive treatment that would bring her up to the level that she would be able to assist in the defense of her case.

Defendant did not offer any transcripts from the competency hearing or any expert testimony relating to Yvette's developmental disability and how it related to the defense. No additional information relating to Yvette's condition, as developed in her competency hearing, was related to the jury. No evidence was presented by the defense as to Yvette's mental or psychological condition at the time of her detention at the Border Patrol checkpoint. The criminal charges were not pursued against Yvette.

## II. MOTION TO SUPPRESS EVIDENCE

### A. Standing

14. Defendant asserts that the trial court erred by denying her motion to suppress the cocaine seized from Yvette's person at the Border Patrol checkpoint. The trial court found that Defendant lacked standing to challenge the search of Yvette's person.

15. We initially address Defendant's assertion that the State waived the issue of standing by failing to raise it at the trial level. This assertion lacks merit. The prosecution, at a pretrial hearing, raised its concern that Defendant lacked standing to challenge Yvette's search, and the trial court ruled on the issue. This was sufficient to alert Defendant so that she could have addressed the standing issue in her supplemental memorandum of law. The State did not waive this issue.

16. Defendant asks this Court to adopt an "automatic" standing rule based upon the constitutional guarantees found in Article II, Section 10 of the New Mexico Constitution. We need not address this interesting question, under the facts of this case, because we find that the cocaine seized from Yvette's person is the fruit of the unlawful arrest and detention of Defendant.

17. Defendant unquestionably has standing to challenge her own unlawful arrest. *See, e.g., Campos v. State*, 117 N.M. 155, 870 P.2d 117 (1994) (standing not at issue when defendant challenged the reasonableness of his own warrantless arrest). "[T]he legality of an arrest is often of crucial importance in determining the admissibility of evidence." Charles H. Whitebread & Christopher Slobogin, *Criminal Procedure: An Analysis of Cases & Concepts* § 3.01 (3d ed.1993). This is so because "[t]he United States Supreme Court has consistently barred the admission of legally obtained evidence derived from past police illegalities

814

under the so-called 'fruit of the poisonous tree' doctrine." *State v. Bedolla,* 111 N.M. 448, 454, 806 P.2d 588, 594 (Ct.App.) (citations omitted), *cert. denied,* 111 N.M. 416, 806 P.2d 65 (1991). In accordance with this doctrine, a defendant may have standing to challenge evidence seized from a third party if the search leading to the seizure of that evidence is an exploitation of the defendant's own unlawful arrest. *See Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *cf.* 5 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* §§ 11.3, at 119–20, 11.4, at 233–34 (3d ed.1996) (discussing the relationship between standing and the fruit of the poisonous tree doctrine). We find that the drugs, although seized from a third person, were discovered as a result of the exploitation of Defendant's own unlawful arrest and detention, and, hence, they are not admissible against Defendant. *Wong Sun,* 371 U.S. at 487, 83 S.Ct. at 417.

**B.  Standard of Review**

■ 18.  Generally, the denial of a motion to suppress evidence will not be overturned on appeal if the denial is supported by substantial evidence. *State v. Porras–Fuerte,* 119 N.M. 180, 184, 889 P.2d 215, 219 (Ct.App. 1994), *cert. quashed,* 121 N.M. 783, 918 P.2d 369 (1996). However, we review mixed questions of law and fact de novo, particularly when they involve constitutional rights. Searches and seizures which impact Fourth Amendment rights present just such a question. *State v. Flores,* 122 N.M. 84, 87, 920 P.2d 1038, 1041 (Ct.App.1996).

**C.  Reasonable Suspicion for Investigatory Stop**

19.  At her suppression hearing, Defendant principally argued that the stop on Highway 54 was improper because there was no reasonable suspicion to support such a stop. The trial court denied the motion, finding that reasonable suspicion to support an investigatory stop existed. We agree.

■ 20.  Reasonable suspicion to allow an officer to make an investigatory stop exists if the officer is " 'aware of specific articulable facts, together with rational inferences from

those facts,' and these facts and inferences ... provide the basis for the suspicion." *State v. Galvan,* 90 N.M. 129, 131, 560 P.2d 550, 552 (Ct.App.1977) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975)). Reasonable suspicion is judged by an objective standard which evaluates whether the facts available to the officer would "warrant the officer, as a person of reasonable caution, to believe the action taken was appropriate[.]" *Id.*

■ 21.  In the present case, the tip to the FBI that Defendant might be in El Paso and would be transporting an unspecified quantity of cocaine provided the necessary facts. When the vehicles, matching the descriptions provided by the tip and travelling in the direction implied by the tip, passed through the checkpoint, Border Patrol Agent Esquivel had reasonable suspicion to order an investigatory stop. The stop on Highway 54 was proper. *See Flores,* 122 N.M. at 88, 920 P.2d at 1042 (finding reasonable suspicion under similar circumstances).

**D.  Probable Cause to Effect Arrest**

22.  Our finding of reasonable suspicion to make the investigatory stop does not end the discussion of whether the trial court properly denied Defendant's motion to suppress the evidence. The trial court found that Defendant's return to the checkpoint constituted an arrest; however, the court made no findings that probable cause existed to support the arrest. Although we do not agree with the trial court that Defendant was arrested when she was ordered to return to the checkpoint, we do find that the circumstance of detaining Defendant for a prolonged period of time after her return to the checkpoint so as to be searched by a female agent who had to be summoned from another location, together with the failure of the searches of her car and that of Ibarra to disclose any contraband, ripened into a "de facto arrest" without probable cause. Hence we reverse the denial of Defendant's motion to suppress the evidence obtained as a result of the exploitation of Defendant's unlawful arrest.

23. We acknowledge that it is difficult to pinpoint the moment in time when an investigatory stop becomes a de facto arrest because there is no bright-line test for doing so. *See State v. Werner*, 117 N.M. 315, 318, 871 P.2d 971, 974 (1994). Instead, we must apply a balancing test in which the Court weighs " 'both the character of the official intrusion [on the person's liberty] and its justification.' " *Id.* at 318, 871 P.2d at 974 (quoting *Michigan v. Summers*, 452 U.S. 692, 701, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981)).

24. Our Supreme Court has identified three factors to utilize when making this determination: length of the detention, place of the detention, and restriction on the defendant's freedom of movement. *Id.; see also Flores*, 122 N.M. at 89, 920 P.2d at 1043. Applying these factors, we note that Defendant was removed from the site of the initial stop on the highway and taken, under police escort, to the Border Patrol checkpoint. At the checkpoint she was told to get out of her vehicle and taken to a trailer for questioning. The checkpoint was controlled by federal agents. Defendant was detained at the checkpoint for approximately two hours before the female agent performed the strip search which led to the discovery of the cocaine on her daughter Yvette's person. During this time, Defendant asked for and was denied permission to leave. Under these circumstances, we conclude that the detention of Defendant after she was returned to the Border Patrol checkpoint constituted a significant intrusion, and it was reasonable for Defendant to have felt deprived of her freedom during this period.

25. The significance of this intrusion, however, must be balanced against the weight of the "government's justification for the intrusion." *Werner*, 117 N.M. at 318, 871 P.2d at 974. In evaluating the government's justification, we note that:

> Diligence in the investigation is key, and the expansion of the investigation to look, search, or fish elsewhere is not contemplated for investigatory stops. The concept of diligence has an aspect of speed or haste. As soon as the investigation requires awaiting the development of circum-

stances off the scene, the validity of the investigatory stop becomes suspect.

*Id.* at 319, 871 P.2d at 975.

26. Prior to the strip searches of Defendant and Yvette, the narcotics dog had failed to alert to the presence of drugs about the vehicle. The agents' search of Defendant's vehicle and that of Ibarra failed to produce any drugs or drug paraphernalia. Throughout her interrogation at the checkpoint, Defendant denied that she possessed or had knowledge of drugs. The vehicle was allowed to pass through the checkpoint initially because no suspicious behavior was detected. We hold that Defendant's continued detention at the checkpoint for almost two hours, under these circumstances, and while awaiting the arrival of a female agent, ripened into a "de facto" arrest and that Defendant was arrested by the time the search of her person, and that of Yvette, was conducted by the female agent.

27. When a detention becomes a de facto arrest, a showing of probable cause is required to support it. *Id.* at 319, 871 P.2d at 975. Therefore, we examine whether there was probable cause to arrest Defendant prior to the search of her person and that of Yvette. "Probable cause exists when the facts and circumstances within the officers [sic] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." *State v. Blea*, 88 N.M. 538, 540, 543 P.2d 831, 833 (Ct.App.), *cert. denied*, 89 N.M. 5, 546 P.2d 70 (1975). The facts and circumstances within the Border Patrol agents' knowledge when Defendant was ordered to return to the checkpoint were limited to a confidential informant's tip and the information they had received during their initial search of the vehicles and questioning of the occupants. Although the information obtained prior to the arrest may have corroborated the connection between Defendant's vehicle and Ibarra's vehicle that was indicated by the tip, neither this corroboration nor the tip itself was enough to establish probable cause for an arrest.

28. In New Mexico, probable cause can be based on an informant's tip only when the responding officers have a substantial basis for believing the informant is reliable and the informant's basis of knowledge is established. *State v. Cordova*, 109 N.M. 211, 214, 784 P.2d 30, 33 (1989). In the present case, Agent Garcia testified that, although the informant was reliable, the informant's basis of knowledge was not explored and he had no information regarding that prong of the *Cordova* requirement. Moreover, the tip itself did not supply any details regarding the amount of cocaine, the identity of the suspect's passengers, where in the vehicle or on the suspect's person the drugs were being carried, or what route the suspect was taking.

29. The other information received prior to Defendant's arrest only confirmed the tip "in neutral, non-incriminating details [which form] a thin foundation" on which to support an arrest. *Flores*, 122 N.M. at 89, 920 P.2d at 1043. While the apparent contradiction between Defendant's initial denial that she knew Ibarra and the physical evidence linking the two individuals may be enough to lessen Defendant's credibility, it is not enough to establish probable cause. *Cf. Florida v. Royer*, 460 U.S. 491, 507, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (probable cause not established by fact that individual who fit drug-courier profile exhibited nervous demeanor and failed to adequately explain why his driver's license and baggage tags listed different names). Hence, we conclude that Defendant's constitutional right to be free from unreasonable searches and seizures was violated because there was no probable cause to support her de facto arrest at the Border Patrol checkpoint.

**E. Consent to Search**

30. Next, we address the trial court's ruling that Yvette's consent to the strip search was "effective" and acted as a waiver to any objection Defendant might have to the search. The "fruit of the poisonous tree" doctrine bars the admission of evidence obtained after an illegal arrest or detention except in very limited circumstances. *See Bedolla*, 111 N.M. at 454, 806 P.2d at 594. To determine whether such circumstances are present in this case, we look for a break in the causal chain leading from Defendant's unlawful arrest to the search of Yvette's person. *Id.* at 454–55, 806 P.2d at 594–95 (citing *Brown v. Illinois*, 422 U.S. 590, 601–02, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975)).

31. The State contends that Yvette's consent to the search provided such a break in the causal chain. We acknowledge that "a valid consent may obviate the need for . . . probable cause." *Id.* at 453, 806 P.2d at 593. However, consent removes the taint of an illegal detention only if there was sufficient attenuation between the detention and the consent to search. *Id.* at 454, 806 P.2d at 594. We look at " '[t]he temporal proximity of the arrest and the [consent], the presence of intervening circumstances, (citations omitted) and, particularly, the purpose and flagrancy of the official misconduct' " to determine whether consent was sufficiently attenuated to remove the taint of the illegal arrest from the consent. *Id.* at 455, 806 P.2d at 595 (quoting *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62).

32. In the case before us, the agents had no probable cause to arrest Defendant or Yvette prior to the discovery of the cocaine. The informant's tip upon which the initial investigatory stop was premised did not name Yvette as a suspect. Yvette and her infant daughter merely were travelling as passengers in a vehicle owned and driven by Defendant when Defendant was stopped because of a tip that Defendant was carrying cocaine. Nonetheless, Yvette was not free to leave after being detained and sent back to the checkpoint along with Defendant, the infant, and Defendant's vehicle.

33. Upon their arrival at the checkpoint, Defendant and Yvette were told to get out of the vehicle and were taken inside a trailer. Defendant requested and was denied permission to leave the checkpoint. Only after a narcotics dog sniffed Defendant's vehicle with Defendant's consent and no drugs were revealed did the agents ask Defendant and Yvette to consent to a strip search. Defendant and Yvette remained at the checkpoint some two hours before the strip searches

were conducted by the female agent. During this time the agents searched Defendant's vehicle and again found no drugs. When the female agent arrived, she asked for and received consent from Yvette and Defendant to perform the strip searches.

34. Under these circumstances, we find no intervening or attenuating events that would cleanse Yvette's consent of the taint flowing from Defendant's illegal arrest and detention at the checkpoint. Prior to the search of Yvette's body, the agents found no independent evidence confirming their suspicion that Defendant or Yvette were carrying drugs. Prior to the search of Defendant's and Yvette's bodies, neither woman was free to leave. On the contrary, the agents continued to detain the women while embarked on an expedition for evidence that was entirely fruitless until the strip search of Yvette was performed.

35. Here, as in *Bedolla,* the illegality of the arrest " 'had a quality of purposefulness.' The arresting officer acknowledged in his testimony that there were no signs of criminal activity and the only purpose for the stop was to investigate the tip." *Id.* at 456, 806 P.2d at 596 (quoting *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262). " 'The arrest, both in design and in execution, was investigatory. The [officers] embarked upon this expedition for evidence in the hope that something might turn up.' *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262." *United States v. Recalde,* 761 F.2d 1448, 1459 (10th Cir.1985).

36. Applying the *Bedolla* factors, we hold that Yvette's purported consent did not purge the taint of the unlawful arrest of both Yvette and Defendant and, thus, the trial court should have suppressed the cocaine found on Yvette's person and the statements by Defendant and Yvette that followed its discovery. This evidence was obtained as a result of the exploitation of Defendant's unlawful arrest. *See Wong Sun,* 371 U.S. at 487, 83 S.Ct. at 417 (defendant may challenge evidence seized from third party where evidence is obtained as an exploitation of defendant's own unlawful arrest).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

37. Defendant also raises the issue of ineffective assistance of counsel. This issue is founded upon trial counsel's failure to move to suppress Defendant's unwarned statements to agents regarding her relationship with Ibarra. Because we determine that all evidence obtained as a result of the exploitation of Defendant's unlawful arrest must be suppressed, we need not reach Defendant's ineffective assistance of counsel issue.

## IV. SUFFICIENCY OF THE EVIDENCE

38. Even though our holding on probable cause mandates a new trial, we must consider whether there is sufficient evidence to support a conviction because, if not, the charges must be dismissed and the case cannot be retried. *State v. Lopez,* 109 N.M. 578, 582, 787 P.2d 1261, 1265 (Ct.App.1990). In reviewing a claim of insufficient evidence, this Court views the evidence, whether direct or circumstantial, in the light most favorable to the verdict. *State v. Sizemore,* 115 N.M. 753, 758, 858 P.2d 420, 425 (Ct.App.), *cert. denied,* 115 N.M. 709, 858 P.2d 85 (1993). The question is whether the evidence supports "a verdict of guilt beyond a reasonable doubt with respect to every element of the crime." *Id.* In making this determination, we consider the illegally admitted evidence as well as the properly admitted evidence. *See State v. Post,* 109 N.M. 177, 181, 783 P.2d 487, 491 (Ct.App.1989).

39. To convict Defendant of possession of cocaine, the jury had to find that Defendant had cocaine in her possession and knew or believed it to be cocaine. NMSA 1978, § 30–31–23(A) (Cum.Supp.1996). We find sufficient evidence in the record to support the verdict on Count I.

40. The cocaine that forms the basis of the convictions in this case was not in Defendant's actual possession; rather, it was concealed in Yvette's clothing. However, proof of actual possession is not necessary to sustain the conviction; a person may constructively possess contraband "not in his physical presence if he knew what it was and

exercised control over it." *State v. Muniz,* 110 N.M. 799, 800, 800 P.2d 734, 735 (Ct. App.), *cert. denied,* 110 N.M. 749, 799 P.2d 1121 (1990). The evidence showed: (1) Defendant owned and had control of car she was travelling in with Yvette; (2) Yvette was carrying cocaine concealed on her person; (3) Yvette is easily influenced to do wrong; and (4) when law enforcement officers informed Defendant that they were going to arrest her daughter for carrying drugs, she insisted that they arrest her instead, stating that her daughter had been forced to carry the drugs. These facts constitute sufficient evidence to support a reasonable inference that Defendant exercised sufficient control over Yvette so as to impart on Defendant constructive possession of the cocaine.

█ 41. To support Defendant's conviction of conspiracy, the State had the burden to prove that Defendant agreed with someone to commit the underlying offense and intended to commit the underlying offense. *State v. Villalobos,* 120 N.M. 694, 698, 905 P.2d 732, 736 (Ct.App.1995), *cert. quashed,* 121 N.M. 676, 916 P.2d 1343 (1996); NMSA 1978, § 30–28–2 (Repl.Pamp.1994); NMSA 1978, § 30–31–20(A)(3) (Cum.Supp.1996). Such proof may be established by inference from circumstantial evidence. *State v. Bankert,* 117 N.M. 614, 622, 875 P.2d 370, 378 (1994). The primary question is whether circumstances, taken together, show the parties united to accomplish an illegal scheme. *State v. Olguin,* 118 N.M. 91, 99, 879 P.2d 92, 98 (Ct.App.1994), *rev'd on other grounds,* 120 N.M. 740, 906 P.2d 731 (1995). We find sufficient evidence to support Defendant's conviction for conspiracy.

█ 42. The evidence on which the jury could have relied to determine that Defendant "knowingly combin[ed] with another for the purpose of committing a felony," Section 30–28–2, included the following: (1) Defendant made an eight-hour round trip drive to Juarez, but stayed only a short time and made no significant purchases; (2) Defendant's vehicle was closely followed by Jose Ibarra, who was driving a vehicle which matched the one described by the confidential informant; (3) "mules" often carry drugs across the border and are sometimes accompanied by escort cars which either follow them through border checkpoints or travel a little in front of them; (4) Defendant repeatedly denied knowing Ibarra even though she had been romantically involved with him for several years, she was carrying his mail in her car, and he carried a picture of her granddaughter; (5) Defendant claimed that Yvette was forced to carry the drugs; and (6) when asked if Ibarra had forced her daughter to carry the drugs, she hesitated before answering that he had not.

43. Yvette was carrying quantities of drugs from which the jury could reasonably have inferred, based on Agents Norbert Sanchez' and Billy Artiaga's testimony, that the cocaine was not for personal use. Furthermore, Yvette testified that she was going to deliver the drugs at Burger King in Alamogordo.

44. We find that the evidence before the jury was sufficient to support the conviction for conspiracy to traffic cocaine by possession with intent to distribute.

## V. CONCLUSION

45. We find that the trial court erred by denying Defendant's motion to suppress the evidence obtained after she was arrested without probable cause. Therefore, we reverse Defendant's conviction on both counts and remand for a new trial consistent with this opinion.

46. IT IS SO ORDERED.

APODACA, C.J., and DONNELLY, J., concur.