This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellant,

v.                                                                    **No. A-1-CA-35043**

**DANAN BERNARDO GABALDON,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Briana H. Zamora, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellant

Bennett J. Baur, Chief Public Defender
B. Douglas Wood III, Assistant Appellate Defender
Santa Fe, NM

for Appellee

## MEMORANDUM OPINION

**BOHNHOFF, Judge.**

{1}    At approximately 8:00 a.m. on March 3, 2015, and in response to a call to the Bernalillo County Sheriff's Department regarding a suspicious white van that was parked in front of a house under construction in Bernalillo County's South Valley, Sheriff's Officer Lee Madrid attempted to question Defendant Danan Gabaldon as he was seated in the van. Instead of rolling down his window and speaking with Officer Madrid, Defendant drove off. A chase ensued and Defendant ultimately was arrested and indicted for several crimes including aggravated fleeing a law enforcement officer in violation of NMSA 1978, Section 30-22-1.1(A) (2003), and assault with intent to commit a violent felony upon a peace officer in violation of NMSA 1978, Section 30-22-23 (1971). Defendant successfully moved to suppress statements and other evidence obtained as a result of the episode on the grounds that the initial encounter was an illegal seizure in violation of Article II, Section 10 of the New Mexico Constitution. The State appeals. We reverse.

**BACKGROUND**

{2}    The exclusionary rule generally bars the State from using, in connection with a criminal prosecution, evidence obtained as a direct result of an unlawful seizure. *See, e.g.*, *State v. Portillo*, 2011-NMCA-079, ¶ 25, 258 P.3d 466 (holding that "evidence discovered as a result of the exploitation of an illegal seizure must be suppressed

2

unless it has been purged of its primary taint"). Defendant's August 20, 2015 motion sought an order suppressing the State's use of the following evidence:

1.   Any and all controlled substances and/or drug paraphernalia seized from the person or property of Defendant on or about March 3, 2014 [sic].

2.   Any and all statements made by Defendant as the result of the illegal search and seizure of his or her person on March 3, 2014 [sic].

3.   All other fruits of the unconstitutional and unlawful seizure or search of Defendant.

{3}   At the September 11, 2015 hearing on the motion to suppress, the district court heard testimony from four sheriff's deputies, including Officer Madrid. On the basis of that testimony, the court made the following findings of fact, which neither the State nor Defendant challenge, in its September 30, 2015 order, granting the motion to suppress:

1.   Officer Lee Madrid was dispatched to an address near Barcelona SW in Albuquerque, New Mexico in reference to a "suspicious vehicle."

2.   Specifically, dispatch reported that the caller referenced a suspicious white van parked at a vacant residence that was under construction.

3.   According to the anonymous caller, the occupants of the van were looking around the house and through the windows.

4.   Officers Madrid and [Haworth] arrived at the residence in their police uniforms in two separate marked police vehicles.

3

5. As they arrived, Officer Madrid observed a white van parked on the east side of the residence. The engine on the van was still running.

6. Officer Madrid admittedly knew nothing about the van parked near the residence. He did not know whether the van possibly belonged to a construction worker or the owner of the house.

7. Initially when Officer Madrid approached the van, there was a male and female lying in the back of the van. They appeared to be asleep. The driver and passenger seats of the van were empty.

8. Officers Madrid and [Haworth] executed a perimeter check around the residence; they verified no one was in or near the vacant residence.

9. Officer Madrid completed a perimeter check before approaching the van to ensure that no one would unexpectedly approach them as they were questioning the occupants of the van.

10. No one was located at the house during the perimeter check.

11. After completing the perimeter check, Officers Madrid and [Haworth] approached the van to determine why the occupants were at the house and what they were doing there.

12. . . . Defendant . . . was now in the driver's seat and the female was in the passenger's seat. This concerned Officer Madrid. This led him to believe the occupants of the van were trying to flee.

13. Officer Madrid ran up to . . . the Defendant's van. He pounded on the windows of the van, telling . . . Defendant, "Sheriff's Department." Officer Madrid instructed . . . Defendant to roll down his window.

14. Officer Madrid grabbed onto the driver's side mirror to stabilize himself as he approached . . . Defendant's van.

4

15. Officer Madrid testified that during the initial encounter with . . . Defendant, . . . Defendant was not free to leave.

16. . . . Defendant looked at Officer Madrid and smiled. . . . Defendant put the van in gear and "took off down the road."

{4} The district court concluded that this encounter was a seizure within the meaning of Article II, Section 10 of the New Mexico Constitution, which generally prohibits law enforcement from seizing individuals without first obtaining a warrant. *See State v. Garcia*, 2009-NMSC-046, ¶ 37, 147 N.M. 134, 217 P.3d 1032 (holding that a person is seized if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" (internal quotation marks and citation omitted)); *State v. Rowell*, 2008-NMSC-041, ¶ 10, 144 N.M. 371, 188 P.3d 95 ("Any warrantless search analysis must start with the bedrock principle of both federal and state constitutional jurisprudence that searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable, subject only to well-delineated exceptions." (emphasis, internal quotation marks, and citation omitted)). The court rejected the State's argument that the seizure was subject to the "community caretaker" exception to the warrant requirement. *See State v. Ryon*, 2005-NMSC-005, ¶ 24, 137 N.M. 174, 108 P.3d 1032 (holding that warrants, probable cause to arrest, and reasonable suspicion to conduct an investigatory stop are not required when police act as community caretakers

5

unrelated to crime-solving). The court also rejected the State's alternative argument that the initial encounter was subject to an exception for investigatory detentions that are supported by reasonable suspicion. *See State v. Jason L.*, 2000-NMSC-018, ¶ 20, 129 N.M. 119, 2 P.3d 856 (noting that "not all seizures are unconstitutional. We recognize an officer may detain a person in order to investigate possible criminal activity. Investigatory detention is permissible when there is a reasonable and articulable suspicion that the law is being or has been broken" (internal quotation marks and citation omitted)). Accordingly, the district court granted the motion.

{5}     The State timely appealed the district court's suppression order pursuant to NMSA 1978, Section 39-3-3(B)(2) (1972), and Rule 12-201(A)(1)(a) NMRA.

**DISCUSSION**

{6}     On appeal, the State does not contest the district court's determination that Officer Madrid's initial encounter with Defendant constituted a seizure. The State also does not continue to argue that the seizure was permissible under the community caretaker exception. However, the State maintains that Officer Madrid had reasonable suspicion to conduct an investigatory detention of Defendant. Alternatively, the State advances several theories in arguing that events that occurred after Defendant drove off from the house under construction effectively purged any taint that resulted from the illegal initial seizure, such that the exclusionary rule should not be applied to

suppress the State's use of any of the evidence in question. Defendant urges that the State failed to raise and preserve below these alternative arguments.

**{7}** "The standard of review for suppression rulings is whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party." *Jason L.*, 2000-NMSC-018, ¶ 10 (internal quotation marks and citation omitted). In doing so, the appellate court "observe[s] the distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts, which is subject to de novo review." *State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (alteration, internal quotation marks, and citation omitted); *see Garcia*, 2009-NMSC-046, ¶ 9 ("Determinations of reasonable suspicion are reviewed de novo.").

**Investigative Detention Standards**

**{8}** As stated above, "[i]nvestigatory detention is permissible when there is a reasonable and articulable suspicion that the law is being or has been broken. A reasonable suspicion is a particularized suspicion, based on all the circumstances that a particular individual, the one detained, is breaking, or has broken, the law." *Jason L.*, 2000-NMSC-018, ¶ 20 (internal quotation marks and citation omitted); *State v. Cobbs*, 1985-NMCA-105, ¶ 12, 103 N.M. 623, 711 P.2d 900 ("The officer must be

able to base such reasonable suspicion upon specific articulable facts, together with rational inferences from those facts." (internal quotation marks and citation omitted)).

**{9}** "Reasonable suspicion is judged by an objective standard[.]" *State v. Hernandez*, 1997-NMCA-006, ¶ 20, 122 N.M. 809, 932 P.2d 499. Determining whether an officer had a reasonable suspicion is assessed considering the totality of the circumstances and common-sense judgments and inferences about human behavior. *See State v. Robbs*, 2006-NMCA-061, ¶ 20, 139 N.M. 569, 136 P.3d 570. In assessing the totality of the circumstances, "police officers may draw on their own experience and specialized training to make inferences from and deductions about the [available] information . . . that might well elude an untrained person." *State v. Neal*, 2007-NMSC-043, ¶ 21, 142 N.M. 176, 164 P.3d 57 (internal quotation marks and citation omitted).

**{10}** "The level of suspicion required for an investigatory stop is considerably less than proof of wrongdoing by a preponderance of the evidence." *State v. Urioste*, 2002-NMSC-023, ¶ 10, 132 N.M. 592, 52 P.3d 964 (internal quotation marks and citation omitted). Thus, "an officer may still form reasonable suspicion without knowing, with some degree of certainty, that a crime had occurred." *Garcia*, 2009-NMSC-046, ¶ 45; *State v. Candelaria*, 2011-NMCA-001, ¶ 15, 149 N.M. 125, 245 P.3d 69 (noting that "[t]he concept of reasonable suspicion has always embraced a certain degree of

8

uncertainty"). However, "[*u*]*nsupported* intuition and *inarticulate* hunches are not sufficient." *Jason L.*, 2000-NMSC-018, ¶ 20 (emphases added) (internal quotation marks and citation omitted); *see Garcia*, 2009-NMSC-046, ¶ 45 ("Mere speculation that [the defendant] may have committed an unspecified crime does not satisfy the constitutional requirement of reasonable suspicion.").

{11}     Importantly, "[a] reasonable suspicion of criminal activity can arise from wholly lawful conduct." *Urioste*, 2002-NMSC-023, ¶ 10 (internal quotation marks and citation omitted). "In determining whether reasonable suspicion exists in a particular case, the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." *State v. Harbison*, 2007-NMSC-016, ¶ 15, 141 N.M. 392, 156 P.3d 30 (internal quotation marks and citation omitted).

**Analysis**

{12}     In *Cobbs*, this Court articulated a useful framework for assessing the legality of the investigatory detention:

> [O]ur first inquiry is to determine what facts were available to [the officer] and what inferences logically flowed from those facts.
>
>           . . . .
>
> The next inquiry is whether [the officer]'s reasonable suspicion can satisfy the objective test: Would the information relayed in the dispatch combined with the officer's observations . . . warrant a person of

9

> reasonable caution in believing that criminal activity was possibly afoot, thus necessitating an investigatory stop?

1985-NMCA-105, ¶¶ 14, 16.

{13}   What facts, and inferences reasonably flowing therefrom, were available to Officer Madrid? First, reasonable suspicion may be based on an anonymous tip, provided it is "suitably corroborated or exhibits[s] sufficient indicia of reliability." *State v. Contreras*, 2003-NMCA-129, ¶ 5, 134 N.M. 503, 79 P.3d 1111. "[A] tip is more reliable if it is apparent that the informant observed the details personally." *Id.* ¶ 12. Officer Madrid knew that a neighbor had contacted the Bernalillo County Sheriff's Department to express concern that he or she had observed a "suspicious" white van parked in front of a vacant residence that was under construction and that the occupants of the van were looking around the house and through the windows. In particular, the suspicion was that the vehicle "was casing the area and burglarizing the area." Officer Madrid inferred that the neighbor did not recognize the van as belonging to another neighbor. He also took into account his experience that construction sites are subject to frequent burglary.

{14}   Second, what Officer Madrid observed struck him as odd. When he arrived at the location, it was approximately 8 a.m. As he approached the van, he heard the engine running, yet no one was sitting in the driver's and passenger seats. When he looked in a van window, he saw a man and a woman lying down in the back of the

van, appearing to be asleep. Officer Madrid and his partner then walked around to see if anyone else was present. They found no one, which would indicate that the man and the woman lying in the van were the people observed by the neighbor a few minutes earlier looking into the house windows.

{15}     Third, Officer Madrid then returned to the van for the purpose of asking Defendant and the woman why they were at the house and what they were doing. He now saw Defendant and the woman in the driver's and passenger seats, respectively, of the van. Officer Madrid concluded they intended to drive off, so he ran up to the driver's door, pounded on the window, and told Defendant to roll down the window.

{16}     In Officer Madrid's words,

> the van was running, so the part about that that was unusual to me was the van was sitting there idling, and—which tells me somebody is awake. I go and don't see anybody in the front, so I'm like, '[h]um, that's interesting.' Now I'm fully expecting to see someone in the yard or around the house, what was called in, when we double check and look in the back of the van when I see two people who appear to be sleeping[.] I'm thinking, '[h]um this is interesting,' just one odd thing after another on that. So then after we check the perimeter of the house, we came back to the van, obviously they were not just sleeping because it took us maybe a minute or two to walk around the house for us to come back to the van which, all of a sudden, they're ready to go in the front seat.

While the district court noted in its decision that Officer Madrid did not *know* whether the van belonged to the owner of the home or a construction worker, he nevertheless reasonably could surmise that this was not behavior one would expect from an owner

or a construction worker. Owners would not likely be walking around their house and looking in the windows, nor would they be lying down in the back of a van with the engine running and then a moment later be seen in the van's front seats. Nor would a construction worker. At 8:00 a.m., a construction worker would be expected to, if anything, be either on the job or preparing to start the day, likely not sleeping in the back of a van whose engine is running. Further, both owners and construction workers could be expected to get out of a vehicle and approach law enforcement officers who are observed walking around their home under construction. The scene that Officer Madrid encountered is reasonably described as "unusual" and "odd" and was, in any event, "a series of acts, each of them perhaps innocent in itself [that] taken together warranted further investigation." *Terry v. Ohio*, 392 U.S. 1, 22 (1968).

{17}    With the foregoing information received from the neighbor's call and then his own observations, together with reasonable inferences, Officer Madrid had more than unsupported intuition or an inarticulate hunch. The facts of this case, therefore, are distinguishable from those of *Garcia*, 2009-NMSC-046, and *State v. Soto*, 2008-NMCA-032, 143 N.M. 631, 179 P.3d 1239. In *Garcia*, the officer knew only that he was called to go to an address to a "possible domestic in progress" in which the caller wanted a man named Joshua Garcia removed from the residence. 2009-NMSC-046, ¶ 2 (internal quotation marks omitted). He saw an individual whom he did not

know at the intersection nearest the address in question and seized the individual. *Id.* ¶¶ 2-3. Because the officer had no information that a specific crime had been committed or that the individual he seized was the responsible party, the seizure was unlawful. *Id.* ¶¶ 45-46. Similarly, in *Soto*, police officers knew only that the defendant was riding a bicycle on a road that ran past a horse racetrack; the officers had no information that the defendant had engaged in any illegal activity. 2008-NMCA-032, ¶¶ 2-3. Here, Officer Madrid could identify Defendant as the person who had been observed by a neighbor who was walking around the home under construction, peering into the windows. He also had seen Defendant engage in behavior that, under the circumstances, was questionable. Officer Madrid reasonably could form a suspicion that Defendant had been attempting to burglarize the residence under construction. *See* NMSA 1978, § 30-16-3 (1971); NMSA 1978 § 30-28-1 (1963).

{18} The facts and holding of *Cobbs* provide guidance. There, a municipal police department relayed to officers in a patrol car information received about suspicious persons and a possible residential burglary in progress: two individuals, including the defendant, had been observed "repeatedly approaching the rear door of a residence and then returning to their vehicle [that] was parked behind the residence." 1985-NMCA-105, ¶ 4. When officers arrived at the residence, they "observed [the] car parked behind the residence with its lights on and two passengers sitting in it." *Id.* ¶ 5.

13

When the car started to leave, the officers pulled it over and, following a patdown of the defendant that revealed a firearm and drugs, arrested the defendant. *Id.* ¶¶ 5-10. On these facts, the officer "was amply justified in stopping the defendant." *Id.* ¶ 17. The facts of this case reasonably give rise to, if anything, more suspicion of criminal activity than those present in *Cobbs*. Officer Madrid therefore properly could undertake an investigatory stop of Defendant in order to ask him why he had been walking around the residence and looking in the windows, and then returning to and lying in the back of the van with its engine running.

{19}     We hold that the district court erred in determining that Officer Madrid did not have reasonable suspicion to seize and detain Defendant, for investigatory purposes, when Officer Madrid observed Defendant in the driver's seat of the van. We decline to consider, as unnecessary, the State's remaining arguments and Defendant's contention that those arguments were not preserved.

**CONCLUSION**

{20}     We reverse the district court's order granting Defendant's motion to suppress evidence and remand for further proceedings in accordance with this opinion.

{21}     **IT IS SO ORDERED.**

_____

**HENRY M. BOHNHOFF, Judge**

14

**WE CONCUR:**

_____

**LINDA M. VANZI, Chief Judge**

_____

**JULIE J. VARGAS, Judge**