# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-046

Filing Date: September 1, 2009

Docket No. 30,937

STATE OF NEW MEXICO,

      Plaintiff-Respondent,

v.

JOSHUA GARCIA,

      Defendant-Petitioner.

ORIGINAL PROCEEDING ON CERTIORARI
Joe Parker, District Judge

Hugh W. Dangler, Chief Public Defender
Joseph P. Walsh, Assistant Appellate Defender
Santa Fe, NM

for Petitioner

Gary K. King, Attorney General
James W. Grayson, Assistant Attorney General
Santa Fe, NM

for Respondent

## OPINION

**SERNA, Justice.**

{1}    Defendant Joshua Garcia appeals his convictions for possession of a controlled substance, contrary to NMSA 1978, Section 30-31-23(A) (1972, as amended through 2005), and resisting, evading, or obstructing an officer, contrary to NMSA 1978, Section 30-22-1(B) (1963, as amended through 1981). He maintains that the evidence obtained against him was the fruit of an unreasonable seizure. We granted certiorari to consider whether Defendant was seized under Article II, Section 10 of the New Mexico Constitution. After applying our interstitial analysis of the federal constitution and concluding that Defendant

1

may not be protected under the Fourth Amendment, we hold that the standard for a seizure under Article II, Section 10 is whether a reasonable person would feel free to leave. Therefore, Defendant was seized when the officer stopped his patrol car in the intersection near where Defendant was walking, shone his spotlight on Defendant, and told him to stop. Because there was no reasonable suspicion to support seizing Defendant, the evidence obtained against him was the fruit of an unreasonable seizure under Article II, Section 10 and must be suppressed. We reverse.

## I.     BACKGROUND AND PROCEEDINGS BELOW

**{2}**     The following account of the events on the evening of Defendant's arrest comes from Officer Lyndell Stansell, Jr.'s narrative of his encounter with Defendant. Neither side contests the narrative; the facts are not in dispute and it contains the only evidence on point. On January 17, 2005, at approximately seven o'clock p.m., the officer was called to a "possible domestic in progress" at an address in Clovis. The dispatcher told the officer that the caller wished to have a man named Joshua Garcia removed from the residence. When the officer arrived at the intersection nearest the address, he saw Defendant walking across the street. There is no evidence that the officer had been acquainted with Defendant, had any prior contact with him, had received a description of him from dispatch, or knew by any other means that Defendant was the man to which the caller was referring.

**{3}**     Immediately upon seeing Defendant, the officer stopped his patrol car in the intersection near Defendant, shone his spotlight on Defendant, exited the patrol car, and "told [Defendant] to stop." Defendant continued walking past the patrol car and the officer "again ordered" Defendant to stop walking. Defendant told the officer that he was "just going to [his] cousin's house." Defendant had his hands in his jacket pockets and was fumbling with something. The officer thought Defendant was about to run, so he shone his flashlight on him, tried to get in front of him, and "yelled at [him] again" to stop. Defendant kept on his way, still fumbling in his pockets.

**{4}**     Fearing that Defendant had a weapon, the officer pulled out his gun and twice ordered Defendant to remove his hands from his pockets. Defendant did not take his hands out of his pockets and continued to try to walk around the officer. Because he continued to fear that Defendant had a weapon and because Defendant had not obeyed his orders, the officer "realized [he] was going to have to physically stop" Defendant.

**{5}**     The officer sprayed Defendant with a one-second burst of pepper spray. Defendant turned to his right and kept walking, still with his hands in his pockets. As Defendant passed in front of a car, the officer saw something fall to the ground. The officer then tackled Defendant and handcuffed him.

**{6}**     The item that fell to the ground appeared to be, and was subsequently confirmed to be, crack cocaine. Another officer searched Defendant incident to his arrest and found marijuana on his person.

2

**{7}** Defendant was charged with possession of cocaine, marijuana, and drug paraphernalia and resisting, evading or obstructing an officer. He moved to suppress any evidence obtained against him as the result of an illegal seizure under either the United States or New Mexico Constitutions. The district court denied the motion, apparently concluding that Defendant had been seized but that there was reasonable suspicion to support the seizure. The district court did not specify whether it considered the issue under both constitutions or the federal constitution alone. Defendant pled guilty to possession of a controlled substance and resisting, evading or obstructing an officer, but reserved his right to appeal the suppression ruling. In a published opinion, the Court of Appeals affirmed the district court on different grounds. *See State v. Garcia*, 2008-NMCA-044, ¶¶ 1, 13, 143 N.M. 765, 182 P.3d 146. It held that, under the Fourth Amendment, Defendant had not been seized and that there was thus no reason to inquire into reasonable suspicion. *See id.* ¶ 1. In opposition to this alternative basis for affirming the district court, Defendant argued that under the Article II, Section 10 of the New Mexico Constitution, he had been seized. The Court of Appeals did not reach Defendant's Article II, Section 10 claim, concluding that he failed to preserve it at the district court. See id. We granted certiorari to consider whether Defendant was seized under Article II, Section 10 of the New Mexico Constitution.[1]

**{8}** On appeal to this Court, Defendant argues that he was seized under Article II, Section 10 of the New Mexico Constitution and that the seizure was unlawful because the officer did not have reasonable suspicion to stop him. Therefore, Defendant argues, the cocaine that he dropped and the marijuana that was on his person were fruits of an illegal seizure and must be suppressed. We agree with Defendant and hold that he was seized under the New Mexico Constitution when the officer stopped his marked patrol car in the intersection near Defendant, shone his flashlight on him, and told him to stop. The officer did not have reasonable suspicion to seize Defendant, and the evidence obtained against him was

---

[1] We denied certiorari on the question of whether the Fourth Amendment of the United States Constitution protects Defendant. However, in this opinion, we do consider the protection provided to Defendant under the federal constitution because, as we discuss below, this preliminary step is mandated under the interstitial approach to state constitutional interpretation propounded in *State v. Gomez*, 1997-NMSC-006, ¶¶ 19-20, 122 N.M. 777, 932 P.2d 1. We recognize that our denial of certiorari on the federal issue may have failed to alert the parties to discuss the issue in their briefing to this court. However, because the scope of federal protection is integral to our determination of the scope of the New Mexico Constitution under *Gomez*, there is no jurisdictional bar to our reaching it. *See State v. Javier M.*, 2001-NMSC-030, ¶ 10, 131 N.M. 1, 33 P.3d 1 (reaching an issue that the appellant did not specifically seek certiorari to review because "it [was] a foundational issue which [was] integral to a complete and thorough analysis of the specific question presented in the petition for writ of certiorari"). Further, because the parties were aware that the federal issue was important and because we can review their full briefing to the Court of Appeals, we believe it is not unfair to consider the protections provided by the Fourth Amendment.

3

therefore the fruit of an illegal seizure and must be suppressed.

## II.    DISCUSSION

### A.    STANDARD OF REVIEW

{9}    The standard of review for suppression rulings is whether the law was correctly applied to the facts, viewing the facts in the manner most favorable to the prevailing party. *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856. Factual determinations are reviewed for substantial evidence and the application of the law to the facts is reviewed de novo. *State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442. Determinations of reasonable suspicion are reviewed de novo. *State v. Harbison*, 2007-NMSC-016, ¶ 8, 141 N.M. 392, 156 P.3d 30.

### B.    PRESERVATION AND THE INTERSTITIAL APPROACH

{10}    The State argues that Defendant did not preserve his state constitutional argument in accordance with *Gomez*, 1997-NMSC-006, ¶¶ 22-23, and that it is therefore not properly before this Court. We conclude that we may properly address it.

{11}    A close examination of the record reveals that whether Defendant was seized in the first instance was not a contentious issue before the district court. Rather, it appears that it was tacitly agreed that Defendant was seized at some point during his encounter with the officer. For example, the State's response to Defendant's motion to suppress did not argue that Defendant had not been seized, but rather spoke in terms of reasonable suspicion:

> An officer's reasonable belief that a suspect is armed and dangerous may follow from a reasonable suspicion that the suspect has committed, is committing, or will commit an 'inherently dangerous crime.' A domestic violence case is an inherently dangerous crime . . . . Consequently, the actions of [the officer] in this case were completely appropriate and led to admissible evidence against [Defendant].

Similarly, the argument at the hearing concerned not whether there was a seizure, but whether reasonable suspicion existed to seize Defendant. To that end, defense counsel stated, "The issue here, Judge, is whether the officer had an articulable suspicion that the person he saw walking across the street at 7 p.m. was committing any crime."

{12}    It was not until the case reached the Court of Appeals that the issue of whether there had been a seizure became contentious. *See Garcia*, 2008-NMCA-044, ¶¶ 23-28. The State proposed in its briefing to the Court of Appeals that the district court be affirmed on the alternative grounds that Defendant was never seized. Defendant's state constitutional claim was a *response* to the State's argument for affirmance on what amounted to right-for-any-reason grounds. *See State v. Granville*, 2006-NMCA-098, ¶ 12, 140 N.M. 345, 142 P.3d 933

4

("[W]e affirm if the trial court decision was right for any reason . . . ."). Given such a posture, we will not impose any preservation requirement on Defendant's response. In this context, it was not incumbent on Defendant to anticipate such a holding by the Court of Appeals and preserve his argument when it was not at issue before the district court. We will review his state constitutional claim.

**{13}** However, before we can reach that claim, our interstitial approach to state constitutional interpretation mandates that we consider whether Defendant was protected under the federal constitution. In *Gomez*, 1997-NMSC-006, ¶ 19, we held that "[u]nder the interstitial approach, the court asks first whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined."

## C.     THE FOURTH AMENDMENT

**{14}** We believe that in light of recent changes in Fourth Amendment jurisprudence, there is serious uncertainty as to whether the Fourth Amendment protects Defendant by mandating the suppression of the cocaine and marijuana. Although it is clear that evidence that is tainted by an illegal seizure must be suppressed, *see Wong Sun v. United States*, 371 U.S. 471, 488 (1963), the Court of Appeals' opinion in this case reflects how statements in *California v. Hodari D.*, 499 U.S. 621, 626 (1991) cast some uncertainty on the sorts of police actions that will be considered seizures under the Fourth Amendment and the likelihood that evidence taken following an illegal seizure will be suppressible.

**{15}** *Hodari D.* marked a shift in the Supreme Court's search and seizure jurisprudence. Decades before *Hodari D.*, in *Terry v. Ohio*, the United States Supreme Court held that a seizure occurs under the Fourth Amendment when a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." 392 U.S. 1, 20 n.16 (1968). For some time, the Supreme Court tested whether such restraint had occurred under the analysis first announced by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980): "the police can be said to have seized an individual only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (internal quotation marks and citation omitted). However, the Supreme Court has since modified the *Mendenhall* standard for cases involving the assertion of authority by a police officer without the use of physical force, and now employs a test that requires a suspect to *submit* to a show of authority by law enforcement to be protected under the Fourth Amendment. *See Hodari D.*, 499 U.S. at 626.

**{16}** In *Hodari D.*, two officers in an unmarked car were on patrol late one evening when they came around a corner and saw a group of youths, which included the defendant, huddled together. *Id.* at 622. When the youths saw the officers approaching, they "took flight." *Id.* at 622-23. As one of the officers chased the defendant on foot, the defendant discarded a small rock. *Id.* at 623. The officer tackled the defendant, handcuffed him, and

5

recovered the discarded rock, which was later found to be crack cocaine. *Id.*

**{17}** The defendant in *Hodari D.* moved to suppress the crack as the fruit of an illegal seizure under the Fourth Amendment but was denied by the district court. *Id.* The California Court of Appeals reversed, holding that, under *Mendenhall*, the defendant had been seized at the moment that he saw the officer running toward him, the seizure was unreasonable under the Fourth Amendment, and the crack was the fruit of the illegal seizure. *Id.* The United States Supreme Court reversed and held that, for the purposes of the Fourth Amendment, a seizure requires either physical force or submission to an assertion of authority. *Id.* at 626. Because the defendant had not submitted to the officer's assertion of authority, i.e. pursuit, he had not been seized when he discarded the crack and it was thus abandoned and admissible against him. *Id.* at 625-27. Thus, whether a reasonable person would feel free to leave–the test under *Mendenhall*–is now a condition precedent, but is not necessarily itself sufficient, for a seizure by assertion of authority to occur under the Fourth Amendment. *Id.* at 628.

**{18}** Though *Hodari D.* presented an instance of assertion of authority, the Court also discussed, in dicta, what it took to be the standard for seizure by physical force:

> To constitute an arrest . . . the quintessential seizure of a person under our Fourth Amendment jurisprudence – the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient. . . .

*Id.* at 625 (internal quotation marks and citation omitted). Thus, no submission would seem to be required in cases involving the application of physical force. However, the Court went on to explain an exception to this theory:

> To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity. If, for example, [the officer] had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest.

*Id.*

**{19}** Applying *Hodari D.* to the instant case, our Court of Appeals held that Defendant was not seized and that, even if the officer had seized Defendant by pepper spraying him, the drugs were not suppressible because the seizure ended before Defendant dropped the cocaine. *See Garcia*, 2008-NMCA-044, ¶¶ 23, 28. We first address whether there was a seizure and then address, under *Hodari D.*, whether the seizure terminated and what effect this conclusion might have on the suppression of the evidence.

6

**{20}** The Court of Appeals concluded that Defendant had not been seized under the Fourth Amendment because "there [was] no indication that Defendant was affected or even deterred to the slightest degree from his voluntary actions" by the pepper spray. *Id.*¶ 23. We disagree. To ascertain whether the officer's application of pepper spray to Defendant's body was physical force sufficient to constitute a seizure, it is irrelevant whether Defendant's movement was restrained, affected, or deterred. Unlike assertion-of-authority cases, there is no need for a defendant to demonstrate submission in cases of physical force. *See, e.g.*, *Carr v. Tatangelo*, 338 F.3d 1259, 1268 (11th Cir. 2003) (holding that the suspect was seized under the Fourth Amendment when he was struck by a police bullet, though he was still able to run across the street and take refuge in his home); *Tom v. Voida*, 963 F.2d 952, 955, 957 (7th Cir. 1992) (holding that an individual was seized when, after a chase, an officer attempted to handcuff and then fought with him, after which he continued to flee); *Yelverton v. Vargo*, 386 F.Supp.2d 1224, 1228 (M.D.Ala.2005) (finding that an individual was seized after being pepper sprayed by an officer, despite his subsequent flight). Rather, Defendant demonstrated that he was seized by showing that he was pepper sprayed, regardless of his subjective reaction.

**{21}** Since Defendant established that he was seized by virtue of the pepper spray, the next issue is the effect of the *Hodari D.* language quoted above that advises that a Fourth Amendment seizure ends when the suspect escapes or breaks away from the police. The Court of Appeals evidently drew two conclusions from this passage: first, that a seizure effected by physical force is terminated the moment physical contact is broken; and second, that if the suspect is not seized at the moment that he or she discloses the evidence, such evidence may not be suppressed as the fruit of the illegal seizure. *See Garcia*, 2008-NMCA-044, ¶¶ 24, 28 ("Because Defendant walked away from the attempted seizure before he cast away the drugs and was tackled, we conclude that Defendant was not seized under the Fourth Amendment; rather, he voluntarily abandoned the drugs."). We disagree with both conclusions, but we acknowledge that *Hodari D.* does not clearly rule out the possibility that the officer's seizure of Defendant terminated the moment that Defendant moved away from the officer and that the evidence gleaned subsequently is not suppressible.

**{22}** First, we cannot agree that under the Fourth Amendment Defendant's seizure ended the moment the officer stopped spraying him with mace. The *Hodari D.* Court's hypothetical example of a discontinued seizure seems to contemplate something more than the limited motion that Defendant took away from the officer in the present case. 499 U.S. at 625. For example, in describing the type of action by a suspect that would discontinue his or her seizure, the Court used the terms "escape," "period of fugitivity," and "br[eak] away." *Id.* These words connote a complete, even extended, separation between the suspect and the officer that is lacking in the facts before us. After being pepper sprayed, Defendant only took several strides before he dropped the cocaine and was tackled. During this time, Defendant continued to be under the effects of the pepper spray as evidenced by the fact that he later had to be allowed to decontaminate. It seems irrational to us that the Fourth Amendment would parse into multiple seizures the separate moments of physical contact making up an officer's brief, forceful submission of a suspect. This being said, we must

acknowledge that the United States Supreme Court has not explained what constitutes having "broken away" from an officer, and as such we cannot be certain that under the Fourth Amendment, Defendant was seized at the moment he disclosed the cocaine.

{23}    Our second disagreement with the Court of Appeals concerns whether, if the cocaine was dropped after Defendant's seizure had terminated, it should nevertheless be suppressed. As we previously noted, the Supreme Court in *Hodari D.* wrote:

> If, for example, [the officer] had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, *it would hardly be realistic to say that that disclosure had been made during the course of an arrest*.

499 U.S. at 625 (second emphasis added). We infer that the Court of Appeals read this passage to suggest that any abandoned evidence not disclosed during the course of an arrest is not subject to suppression. Again, we disagree. To hold otherwise would be to substantially limit the well-established fruit of the poisonous tree doctrine on the basis of rather obscure dicta. In *Wong Sun,* the United States Supreme Court held that in determining whether evidence was tainted by illegal police conduct, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 488 (internal quotation marks and citation omitted). The exclusionary rule operates to suppress evidence that is obtained not only "during" but "as a direct result of" an unlawful seizure. *Id.* at 485; *see also Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) (analyzing attenuation with reference to "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct" (citation and footnotes omitted)).

{24}    In the case at bar, where only several strides on Defendant's part intervened between the officer's pepper spraying of Defendant and the dropping of the cocaine, we do not believe the link to the illegal seizure was attenuated, if indeed that seizure had ended at all. Further, because the exclusionary rule is designed to deter unlawful police conduct, such as the unconstitutional application of physical force resulting in the discovery of evidence, we believe the policies of the fruit of the poisonous tree doctrine weigh heavily in favor of suppression. We note that other courts confronting similar situations have excluded evidence on this basis. *See e.g., United States v. Wilson*, 953 F.2d 116, 127 (4th Cir. 1991) (distinguishing *Hodari D.* and suppressing cocaine dropped by the defendant while fleeing from an unlawful seizure because the dropping occurred after the illegal seizure and was the "direct result" of the illegal seizure); *United States v. Newman*, 490 F.2d 993, 995 (10th Cir. 1974) (holding that marijuana that fell out of a truck as the defendants fled an illegal seizure was not abandoned because "[e]verything was triggered by the original illegal intrusion"); *State v. Ingram*, 1998-NMCA-177, ¶¶ 16-17, 126 N.M. 426, 970 P.2d 1151 (suppressing evidence abandoned while the defendant was fleeing from an illegal search because it was

"a direct result" of the illegal search).  Again, however, we must acknowledge that the statements in *Hodari D.* seem to be in conflict with our interpretation of Fourth Amendment case law.

**{25}**    In light of the foregoing, there is serious uncertainty regarding whether the United States Supreme Court would suppress the evidence in this case under the Fourth Amendment's protections against unreasonable searches and seizures.  Because, under our interstitial analysis, we will consider preserved state constitutional claims if the defendant is not protected under the federal constitution, we now proceed to determine whether the evidence against Defendant was unlawfully acquired as the fruit of an unreasonable seizure under Article II, Section 10.  *See State v. Paul T.*, 1999-NMSC-037, ¶ 12, 128 N.M. 360, 993 P.2d 74 ("Because of th[e] gap in Fourth Amendment jurisprudence, together with the possibility that the Fourth Amendment does not protect [the defendant] in the circumstances of this case, we turn to Article II, Section 10 to resolve the issue . . . .").

**D.    ARTICLE II, SECTION 10**

**1.    AN INDIVIDUAL IS SEIZED UNDER ARTICLE II, SECTION 10 WHEN A REASONABLE PERSON WOULD NOT FEEL FREE TO LEAVE**

**{26}**    In analyzing whether Defendant was seized at or before the time that the police obtained the evidence against him, we must address the proper measure of a seizure under the New Mexico Constitution.  We are faced with the question of whether we will follow the United States Supreme Court's lead in modifying *Mendenhall*'s reasonable person standard as articulated in *Hodari D.* or whether, consonant with our power as a sovereign state to interpret our own constitution, we will recognize broader protection under Article II, Section 10.

**{27}**    Under our interstitial approach to interpreting the New Mexico Constitution, we may diverge from federal precedent where the federal analysis is flawed, where there are structural differences between the state and federal governments, or because of distinctive New Mexico characteristics. *Gomez*, 1997-NMSC-006, ¶ 19.  Defendant urges that *Hodari D.* is flawed and that we should reject its holding on that basis.  While we accept Defendant's invitation to depart from *Hodari D.*, we do so because *Hodari D.* does not comport with the distinctive New Mexico protection against unreasonable searches and seizures.

**{28}**    In the seminal opinion of *State v. Cordova*, this Court diverged from Fourth Amendment jurisprudence for the first time on the basis of the distinct character and nature of Article II, Section 10.  109 N.M. 211, 216-17, 784 P.2d 30, 35-36 (1989).  In concluding that the *Aguilar-Spinelli* test, a two-pronged test formulated by the United States Supreme Court in *Aguilar v. Texas*, 378 U.S. 108 (1964) and *Spinelli v. United States*, 393 U.S. 410 (1969), was better suited to the guarantees embedded in the New Mexico Constitution, we noted this Court's "close acquaintance with the problems and traditions of our state,"

9

*Cordova*, 109 N.M. at 216 n.8, 784 P.2d at 35 n.8, and determined that the principles underlying the *Aguilar-Spinelli* test were the same "principles . . . firmly and deeply rooted in the fundamental precepts of the [New Mexico] [C]onstitution[] . . . ." *Id.* at 216, 784 P.2d at 35.

**{29}** Likewise, in *State v. Gutierrez*, we rejected the good faith exception to the warrant requirement as "incompatible with the guarantees of the New Mexico Constitution . . . ." 116 N.M. 431, 432, 863 P.2d 1052, 1053 (1993). Specifically, we held that, while the United States Supreme Court had enunciated that the exclusionary rule, in the context of the Fourth Amendment, was purposed solely on deterring police misconduct, *see United States v. Leon*, 468 U.S. 897, 916 (1984), our search and seizure provision was also directed at protecting the constitutional right to be free from unreasonable search and seizure, whether or not it resulted from police misconduct. *Gutierrez*, 116 N.M. at 446, 863 P.2d at 1067. We recognized that "Article II, Section 10 expresses the fundamental notion that every person in this state is entitled to be free from unwarranted governmental intrusions," *id.* at 444, 863 P.2d at 1065, and thus identified a broader protection to individual privacy under the New Mexico Constitution. *See, e.g.*, *Campos v. State*, 117 N.M. 155, 158-59, 870 P.2d 117, 120-21 (1994) (basing its rejection of the "blanket federal rule" that all warrantless arrests of felons, which are based on probable cause and occur in public places, are constitutionally permissible on the right to be free from unwarranted governmental intrusion under Article II, Section 10); *Granville*, 2006-NMCA-098, ¶ 33 (citing the distinct state characteristic of greater privacy protection under Article II, Section 10 and concluding that, in New Mexico, it is reasonable to have an expectation of privacy in one's garbage placed for collection, contrary to federal law).

**{30}** The distinct and strong New Mexico protection from unreasonable search and seizure is apparent in various other applications. *See, e.g.*, *Gomez*, 1997-NMSC-006, ¶¶ 36, 39 (recognizing New Mexico's strong preference for warrants and concluding that the federal automobile exception to the warrant requirement is inconsistent with that distinct state characteristic); *State v. Ochoa*, 2009-NMCA-002, ¶¶ 24, 26, 146 N.M. 32, 206 P.3d 143, *cert. granted*, 2008-NMCERT-012, 145 N.M. 572, 203 P.3d 103 (citing the distinct New Mexico characteristic of a preference for a reasonableness analysis over the bright line rules used by the federal courts in the context of search and seizure and concluding that the blanket federal rule allowing pretextual traffic stops as an exception to the warrant requirement is inconsistent with the New Mexico preference for reasonableness).

**{31}** As the above cases demonstrate, Article II, Section 10 is calibrated slightly differently than the Fourth Amendment. It is a foundation of both personal privacy and the integrity of the criminal justice system, as well as the ultimate regulator of police conduct. While all three of these purposes overlap and intertwine, it is the regulation of police conduct with which the instant case is most concerned. We must thus ask whether adopting *Hodari D.* under Article II, Section 10 will serve the robust character and honored history of that constitutional provision with special attention to its purpose of police regulation. *Cf. Gutierrez*, 116 N.M. at 446, 863 P.2d at 1067 ("[t]he primary responsibility for enforcing the

10

Constitution's limits on government, at least since the time of *Marbury v. Madison*, has been vested in the judicial branch.") (internal quotation marks and citation omitted). We conclude that it will not.

**{32}** Rather than maintaining *Mendenhall*'s focus on the nature of police conduct, *Hodari D.* makes the applicability of the Fourth Amendment contingent upon the suspect's reaction. As a result, a suspect submitting to an officer's assertion of authority will be seized at the time of the assertion, where a non-submitting suspect will not be seized until there is either physical force or subsequent submission to the assertion. Thus, *Hodari D.* defines the nature of the government action, i.e. whether a police action is a seizure or not, only in relation to the subjective reaction of the suspect. This indeterminacy is cause for concern in that it fails to provide law enforcement with a useful framework with which to predict when its actions will trigger constitutional scrutiny. *Cf. Chesternut*, 486 U.S. at 574 (counting among the benefits of the then-controlling *Mendenhall* reasonable person standard the facts that it "calls for consistent application from one police encounter to the next," "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment[,]" and does not vary the scope of Fourth Amendment protection according to the suspect's state of mind).

**{33}** As Defendant points out, numerous states have rejected *Hodari D.* as inconsistent with their state constitutions. *See, e.g.*, *Joseph v. State*, 145 P.3d 595, 604 (Alaska Ct. App. 2006); *State v. Oquendo*, 613 A.2d 1300, 1309-10 (Conn. 1992); *Flonnory v. State*, 805 A.2d 854, 857 (Del. 2001); *Baker v. Commonwealth*, 5 S.W.3d 142, 145 (Ky. 1999); *Commonwealth v. Stoute*, 665 N.E.2d 93, 97-98 (Mass. 1996); *State v. Clayton*, 45 P.3d 30, 34 (Mont. 2002); *State v. Beauchesne*, 868 A.2d 972, 980 (N.H. 2005); *State v. Young*, 957 P.2d 681, 687 (Wash. 1998) (en banc). The opinion has been widely criticized as unprincipled, a departure from Supreme Court precedent, and unwise policy. *See, e.g.*, *Hodari D.*, 499 U.S. at 637, 642 (Stevens, J., dissenting) (calling the analysis of the majority "seriously flawed" and the opinion "creative lawmaking"); *State v. Quino*, 840 P.2d 358, 365 (Haw. 1992) (Levinson, J., concurring) (stating that the case is part of a trend which has left the Fourth Amendment "atrophied to the condition of a vestigial organ"); 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 9.4(d) (4th ed. 2004), at 456 (calling the opinion's propositions alternatively "flawed," "irrelevant," and insufficient to support the holding); Ronald J. Bacigal, *The Right of the People to Be Secure*, 82 Ky. L.J. 145, 146 (1994) (characterizing the case as "the latest manifestation of the Court's surreal and Orwellian view of personal security in contemporary America") (internal quotation marks and citation omitted)).

**{34}** We agree with the other states that *Hodari D.*'s modification of the reasonable person standard weakens the right to be secure from unreasonable searches and seizures beyond a point which may be countenanced under our state constitution. If the right to be free from unreasonable searches and seizures is to include the "right to be let alone," *see Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting), *overruled in part by Katz v. United States*, 389 U.S. 347 (1967), and *Berger v. New York*, 388 U.S. 41 (1967), then

11

allowing the police to assert their authority by pursuing suspects or brandishing weapons without reasonable suspicion, as long as the suspects do not submit, is "anathema to our constitutional freedoms." *See Quino*, 840 P.2d at 365.

**{35}** *Hodari D.* is discordant with Article II, Section 10's robust protection against police misconduct and its protection of personal privacy and the integrity of the criminal justice system. We therefore reject *Hodari D.* and instead maintain *Mendenhall*'s free-to-leave test as the proper measure of a seizure under Article II, Section 10.

**2. DEFENDANT WAS SEIZED UNDER ARTICLE II, SECTION 10 OF THE NEW MEXICO CONSTITUTION**

**{36}** Having clarified that a seizure occurs under Article II, Section 10 with reference only to *Mendenhall*'s reasonable person standard, we now apply that standard to the case at bar to determine whether and at what point Defendant was placed in such a position.

**{37}** "[A] person has been 'seized' . . . only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554 (footnote omitted); *accord State v. Affsprung*, 2004-NMCA-038, ¶ 12, 135 N.M. 306, 87 P.3d 1088. The reasonable person would not feel free to leave when his or her freedom of movement is restrained, *Mendenhall*, 446 U.S. at 554, or when the facts show accosting and restraint, *State v. Lopez*, 109 N.M. 169, 170, 783 P.2d 479, 480 (Ct. App. 1989), *modified on other grounds by Jason L.*, 2000-NMSC-018, ¶ 19 (quoting *Terry*, 392 U.S. at 16). Conversely, "[a]s long as the person to whom [the officer's] questions are put remains free to disregard the questions and walk away," no seizure has occurred. *Mendenhall*, 446 U.S. at 554.

**{38}** An otherwise consensual encounter becomes a seizure under the reasonable person standard when an officer "engag[es] in conduct significantly beyond that accepted in social intercourse." 4 LaFave, *supra*, § 9.4(a), at 425 (footnote omitted).

> "The critical factor is whether the policeman, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens." *Id.* at 425-26 (footnotes omitted).

**{39}** Possible indicators of a seizure are: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Lopez*, 109 N.M. at 170, 783 P.2d at 480 (quoting *Mendenhall*, 446 U.S. at 554). While police are free to engage people consensually to gather information, when they "convey a message that compliance with their requests is required[,]" the reasonable person would not feel free to leave and a seizure has occurred. *Jason L.*, 2000-NMSC-018, ¶ 14 (quoting *Florida v. Bostick*, 501 U.S. 429, 435 (1991)).

12

**{40}** To determine whether a reasonable person would feel free to leave, our courts examine "(1) the conduct of the police, (2) the person of the individual citizen, and (3) the physical surroundings of the encounter." *Jason L.*, 2000-NMSC-018, ¶ 15 (internal quotation marks and citation omitted).

**{41}** Immediately upon seeing Defendant walking across the street, the officer stopped his marked car in the intersection within close proximity to Defendant and shone his spotlight on him. He then "told," "ordered," or "yelled at" Defendant to stop, in a manner clearly indicating that compliance was required. *See id.* ¶ 14. A reasonable person would not have felt free to terminate the encounter and walk away. To be sure, when Defendant attempted to walk away, the officer pursued him and incrementally escalated the intrusion as Defendant declined to engage. While the officer's conduct grew more and more coercive, even his initial actions demonstrated accosting and restraint. *See Lopez*, 109 N.M. at 170, 783 P.2d at 480. Defendant was thus seized under Article II, Section 10 when the officer stopped his marked car in the intersection near Defendant, shone his spotlight on him, and told, ordered, or yelled at Defendant to stop.[2]

### 3. THERE WAS NO REASONABLE SUSPICION TO SEIZE DEFENDANT

**{42}** Having held that Defendant was seized under Article II, Section 10 when the officer stopped his marked car in the intersection near him, shone his spotlight on him, and told him to stop, we must next consider whether the officer had reasonable suspicion to seize Defendant at that time.

**{43}** "Investigatory detention is permissible when there is a reasonable and articulable suspicion that the law is being or has been broken." *Jason L.*, 2000-NMSC-018, ¶ 20 (internal quotation marks and citation omitted). A reasonable suspicion is a "particularized suspicion, based on all the circumstances[,] that a particular individual, the one detained, is breaking, or has broken, the law." *Id.* "Unsupported intuition and inarticulate hunches are not sufficient." *Id.* (internal quotation marks and citation omitted). "Reasonable suspicion must exist at the inception of the seizure. The officer cannot rely on facts which arise as a result of the encounter." *Id.* (internal citation omitted).

**{44}** As outlined above, Defendant was seized under Article II, Section 10 when the

---

[2] By our holding that Defendant was seized, we do not mean to suggest that it was unjustified for the officer to attempt to speak with Defendant to inquire into any connection he may have had to the residence or the domestic incident. *See Mendenhall*, 446 U.S. at 553 ("The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry . . . ."); *Jason L.*, 2000-NMSC-018, ¶ 14 ("The police do not need any justification to approach a person and ask that individual questions; however, the officer may not 'convey a message that compliance with [his or her] requests is required.'") (quoting *Bostick*, 501 U.S. at 435).

13

officer stopped his marked patrol car in the intersection where Defendant was walking, shone his spotlight on him, and told or ordered him to stop. The officer presumably focused on Defendant because of his knowledge of the "possible domestic in progress" and the caller's desire to have a man named Joshua Garcia removed from his or her residence, as well as Defendant's proximity to the residence in question. However, seizing Defendant because he was near the address where the yet-uninvestigated "possible domestic" had occurred was unreasonable because the officer had no articulable, particularized suspicion that Defendant was breaking or had broken the law. *See id.*; *cf. State v. Cobbs*, 103 N.M. 623, 626-27, 711 P.2d 900, 903-04 (Ct. App. 1985) (concluding that reasonable suspicion existed to stop individuals where the officer who was dispatched to investigate a possible residential burglary was told by dispatch that the suspects were repeatedly seen walking from the rear of the residence to a car parked behind the residence and were presently in the car; when the officer arrived at the scene, two individuals were seated in a car parked at the rear of the residence).

**{45}**  First, the officer had no information that a crime had been or was being committed: while the caller's desire to have a man named Joshua Garcia removed from his or her residence *may* have been the result of Joshua Garcia perpetrating some crime, the officer had no knowledge of such crime. Mere speculation that Joshua Garcia may have committed an unspecified crime does not satisfy the constitutional requirement of reasonable suspicion. While an officer may still form reasonable suspicion without knowing, with some degree of certainty, that a crime had occurred, the facts in the present case indicate that the officer did not have enough information to conclude that Defendant was involved in the possible domestic disturbance.

**{46}**  Further, even had the officer known that a crime had been committed, the fact that Defendant was merely walking in the vicinity was not necessarily sufficient to support a reasonable suspicion that Defendant was the responsible party. The officer did not have a description of Joshua Garcia and had no prior contact with him or any other means to independently establish that Defendant was Joshua Garcia. As a result, the officer did not observe Defendant on the property of the address to which the officer was called; he was merely on the same block. It was seven o'clock p.m., not an unusual time for people to be walking in the streets. The connection between Defendant and any crime that may have been in progress was too attenuated to constitute reasonable suspicion.

## III.    CONCLUSION

**{47}**  For the foregoing reasons, we hold that Defendant was seized under Article II, Section 10 when the officer stopped his patrol car in the intersection near where Defendant was walking, shone his spotlight on him, and told him to stop. The seizure was not supported by reasonable suspicion. The evidence against Defendant flowed from the seizure and must be suppressed under Article II, Section 10. We reverse.

**{48}    IT IS SO ORDERED.**

14

_____

PATRICIO M. SERNA, Justice

WE CONCUR:

_____

EDWARD L. CHÁVEZ, Chief Justice


_____

PETRA JIMENEZ MAES, Justice


_____

CHARLES W. DANIELS, Justice

RICHARD C. BOSSON, Justice (specially concurring)

**BOSSON, Justice (specially concurring).**

**{49}**  I concur in the opinion of the majority.  I write separately solely on the issue of preservation.

**{50}**  In addressing any claim under our state Constitution, the threshold issue is always preservation.  Given the unusual posture of this particular case, I agree with the majority that Defendant need not have preserved such a claim at the trial level. However, the Court of Appeals took a different view, and held that Defendant did not do enough to preserve his state constitutional argument.  For its part, the State spent much of its brief arguing that Defendant did not preserve his argument in accordance with *State v. Gomez*, 1997-NMSC-006, ¶¶ 22-23, 122 N.M. 777, 932 P.2d 1.  I disagree with both the State and the Court of Appeals on this point.  I write separately to stimulate (hopefully) a dialogue regarding what we reasonably should continue to demand today—over 12 years after *Gomez*—to preserve a search and seizure argument under Article II, Section 10 of the New Mexico Constitution.

**{51}**  In *Gomez*, this Court set forth a bifurcated framework—now familiar to us all—for preservation of a state constitutional claim with a federal analog.  1997-NMSC-006, ¶¶ 22-23.  "[T]he requirements for preserving the claim for appellate review depend on current New Mexico precedent construing [the] state constitutional provision."  *Id.* ¶ 22.  Where established precedent construes the provision more broadly than its federal counterpart, the claim is preserved by "(1) asserting the constitutional principle that provides the protection sought under the New Mexico Constitution, and (2) showing the factual basis needed for the trial court to rule on the issue."  *Id.*  Where there is no precedent interpreting a state constitutional right differently than its federal equivalent, a litigant must meet a higher burden.  *Id.* ¶ 23.  In these cases, "a party also must assert in the trial court that the state constitutional provision at issue should be interpreted more expansively than the federal counterpart and provide reasons for interpreting the state provision differently from the

15

federal provision." *Id.* (emphases omitted) (footnote omitted).

**{52}**    In our state jurisprudence, a plethora of precedent already interprets Article II, Section 10 more expansively than the Fourth Amendment. *See, e.g.*, *Gomez*, 1997-NMSC-006, ¶¶ 33-40 (requiring exigent circumstances to justify the warrantless search of an automobile, contrary to *United States v. Ross*, 456 U.S. 798, 800 (1982), *modified by Arizona v. Gant*, No. 07-542, slip op. (April 21, 2009)); *Campos v. State*, 117 N.M. 155, 158, 870 P.2d 117, 120 (1994) (declining to adopt the "blanket federal rule" that all warrantless arrests of felons where based on probable cause and in public places are constitutionally permissible); *State v. Gutierrez*, 116 N.M. 431, 432, 863 P.2d 1052, 1053 (1993) (rejecting the good faith exception to the exclusionary rule)). Thus, according to the plain language of *Gomez*, to preserve his claim Defendant needed only to "assert[] the constitutional principle that provides the protection sought under the New Mexico Constitution" and "show[] the factual basis needed for the trial court to rule on the issue." 1997-NMSC-006, ¶ 22; *see also State v. Granville*, 2006-NMCA-098, ¶ 13, 140 N.M. 345, 142 P.3d 933 ("When existing precedent construes a state constitutional provision as providing broader protection than its federal counterpart, the preservation of the state constitutional claim requires no more than preservation of any other claim for appellate review."). He was not required to persuade the court why Article II, Section 10 should be interpreted more expansively or otherwise "provide reasons."

**{53}**    Defendant asserted the constitutional principle at issue when he moved to suppress all evidence seized and cited specifically to both the Fourth Amendment *and Article II, Section 10* of the New Mexico Constitution. Defendant also showed the factual basis for his claim: the officer's narrative was in evidence before the trial court. Thus, Defendant satisfied both of the *Gomez* criteria: he specifically invoked the state constitutional provision at issue and showed the factual basis for his claim. Because our more expansive interpretation of search and seizure under the state Constitution is well-known, then under *Gomez* Defendant need not have done more to preserve his claim.

**{54}**    However, both the State and our Court of Appeals disagree, reading *Gomez* too narrowly, in my view. Rather than looking at the relevant constitutional *provision*, as mandated by *Gomez*, they focus on the particular claim or principle asserted by Defendant. For example, in framing the issue, the Court of Appeals stated that "[o]ur courts have not yet decided whether our state constitution affords greater protection than the Fourth Amendment in determining when a person who does not comply with police orders is seized." *State v. Garcia*, 2008-NMCA-044, ¶ 9, 143 N.M. 765, 182 P.3d 146. In other words, Defendant did not make a specific argument below to distinguish *Hodari D.* from our state Constitution. While I recognize that this confusion may stem from *Gomez* employing both the term "provision" and "principle" in its analysis, *compare* Gomez, 1997-NMSC-006, ¶ 2 *with* ¶ 22, I believe that *Gomez* should properly be interpreted as turning on the prior treatment of the constitutional *provision* at issue.

**{55}**    The reading given *Gomez* by the State and the Court of Appeals is unnecessarily

16

restrictive. In practical effect, it could require litigants to meet the higher *Gomez* burden each time a new argument or fact pattern under search and seizure is brought before a state court. The party would have to remind the court that Article II, Section 10 is interpreted more expansively and provide reasons for the court to do so. This is unduly burdensome in the context of search and seizure, and for the reasons that follow, unnecessary. That reading also conflicts with at least some of our precedent which, admittedly, is at times inconsistent. *See State v. Cardenas-Alvarez*, 2001-NMSC-017, ¶ 13, 130 N.M. 386, 25 P.3d 225 ("While Defendant failed to specify the article and section number of the relevant constitutional provision, he clearly alerted the court to the constitutional principle (the prohibition against unreasonable searches and seizures) under which he sought protection [under the state Constitution]."). Perhaps we should clarify that confusion.

**{56}** I recognize this is not the only way to interpret *Gomez,* and *Gomez* itself is capable of more than one meaning on this subject. Perhaps it is time for a new look. After all, *Gomez* is not inscribed in granite; it is not part of the state Constitution. It is merely a means to an end. In its text, *Gomez* overturned a prior iteration of preservation under the state Constitution on which the Court of Appeals had correctly relied when it rejected the search and seizure argument for lack of preservation. *See State v. Sutton*, 112 N.M. 449, 454, 816 P.2d 518, 523 (Ct. App. 1991). Just as by 1997, *Sutton* no longer served the purposes of justice and an independent development of our state Constitution, so too we should probably take a fresh look every decade or so at whether the preservation requirements of *Gomez* continue to serve us as well.

**{57}** To begin the analysis of the State's position, it is worth noting what should be obvious to everyone. We cannot allow the development of our state Constitution to be retarded by overly burdensome, hyper-technical, and impractical preservation requirements. As New Mexico's highest court, it is our duty and privilege to interpret and develop the New Mexico Constitution. In a government of dual sovereigns, it is imperative that our state Constitution develop to its full potential and protect the rights of our citizens where we deem federal law lacking. *Cf. Granville*, 2006-NMCA-098, ¶ 19 ("New Mexico courts independently analyze state constitutional guarantees when federal law begins to encroach on the sanctity of those guarantees." (Internal quotation marks and citation omitted.)). A heightened preservation requirement for the state Constitution would impede us from addressing legitimate state constitutional concerns. We should reject any "super preservation requirement" or highly technical construction that would, in effect, hold our state Constitution hostage to the vagaries of trial counsel competency. I note, for example, that Defendant's bare citation to the Fourth Amendment, without more, adequately preserved his search and seizure claim under the United States Constitution. Why impose a higher burden on our state litigants to invoke our own Constitution?

**{58}** Further, nearly twenty years have passed since we first breathed independent life into Article II, Section 10 in *State v. Cordova,* and many similar holdings have followed in its wake. 109 N.M. 211, 217, 784 P.2d 30, 36 (1989) (retaining the *Aguilar-Spinelli* test for analyzing the reliability of informant information providing the basis for probable cause

despite the federal courts' abandonment of the test in favor of an inquiry into the totality of the circumstances). It is now common knowledge that our own protection against unreasonable searches and seizures is more robust than its federal analog. Because we charge our judges with knowledge of the law, a simple invocation of Article II, Section 10, alongside a sufficient presentation of the facts, suffices to alert the mind of the trial court that a litigant is seeking broader protection from unreasonable searches and seizures under the New Mexico Constitution.

**{59}** For example, in this case, Defendant's motion to suppress invoked Article II, Section 10 without elaboration. Reading the motion, a trial court should be aware that defense counsel has in mind a separate argument under a provision of the state Constitution that often, but not always, is asserted more expansively than its federal equivalent. For what other purpose would one assert Article II, Section 10 than to tell the court, in a kind of litigator's shorthand, that, "[i]f my Fourth Amendment argument does not persuade you, then let's move on to the state constitution and its added protections for the rights of my client?"

**{60}** What is not clear from the bare motion to suppress is the specific ground or argument; in this case, the reasoning of *Hodari D.* and why we should break with that case under our state Constitution. Clearly, the better practice is for an attorney to make a specific argument to buttress a claim under the state Constitution. In a case like ours, for example, if *Hodari D.* were the obstacle under the Fourth Amendment, then a sound argument from defense counsel would explain the shortcomings of that opinion and why the principles that animate our state Constitution lead to a better result. A good attorney would never leave that argument to chance.

**{61}** However, the harsh reality of trial practice does not make it practicable in every case for counsel to be so thorough. This Court has seen far too many instances in which trial counsel simply overlooked the need for argument to explain the theory of the case. Yet, preservation has never been synonymous with the higher standard of best practices in the profession. I cannot say it better than *Gomez*, 122 N.M. at 786, 932 P.2d at 10:

> Although we expect trial counsel to be well-advised of state constitutional law on a particular subject affecting his or her client's interests, we also recognize that the arguments a trial lawyer reasonably can be expected to articulate on an issue arising in the heat of trial are far different from what an appellate lawyer may develop after reflection, research, and substantial briefing. It is impractical to require trial counsel to develop the arguments, articulate rationale, and cite authorities that may appear in an appellate brief.

In other words, on the appellate bench, we get to review in the cool of the night what trial counsel and the trial court must do in the heat of the day.

**{62}** It does not seem fair to place the burden entirely upon the shoulders of overburdened trial counsel. Under these circumstances, it would not ask too much of the trial court to

18

inquire of counsel the nature of the argument asserted under Article II, Section 10. If, for example, *Hodari D.* were the problem for Defendant, then the court could ask counsel directly to explain why that case should not be followed under Article II, Section 10. This would not take much effort. We recently wrote extensively about *Hodari D.* and the Fourth Amendment, while simultaneously flagging our own concern about "the possibility that Article II, Section 10 may require different standards than those set forth in . . . Hodari D." *State v. Harbison*, 2007-NMSC-016, ¶ 16 n.3, 141 N.M. 392, 156 P.3d 30.

**{63}** Finally, preservation is not an end in itself, but a means to a fair outcome. In the absence of manifest unfairness to either side, such as an incomplete factual record, citation of Article II, Section 10 in a search and seizure case should suffice; it should alert the trial court to the need to address both the state and the federal constitutions before it rejects a motion to suppress. And even if the court is not alerted, of what real import is that to the resolution of a pure question of law? The factual record here is not subject to any material dispute. This Court can decide the *Hodari D.* issue whether or not the trial court addressed it. While in a perfect world the trial court should address each issue first, that aspiration should not be determinative. The statewide interest in development of our state Constitution tips the balance in favor of proceeding, and we should not hesitate to do so.

_____
**RICHARD C. BOSSON, Justice**

**Topic Index for *State v. Garcia*, No. 30,937**

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-SU | Suppression of Evidence |
| CT-FA | Fourth Amendment |
| CT-NC | New Mexico Constitution, General |
| CT-IT | Interstitial Analysis |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-RS | Reasonable Suspicion |
| CA-SZ | Search and Seizure |