This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-40614**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**JUSTIN LEE TIPTON,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Drew D. Tatum, District Court Judge**

Raúl Torrez, Attorney General
Felicity Strachan, Assistant Solicitor General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mallory E. Harwood, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**HANISEE, Judge.**

**{1}** Defendant Justin Tipton appeals his conviction of receipt, transportation or possession of a firearm or destructive device by a felon, contrary to NMSA 1978, Section 30-7-16(A)(1) (2020, amended 2022).[1] Defendant primarily argues that his initial

---

[1]Section 30-7-16 was amended after the incident underlying Defendant's conviction occurred and does not affect this appeal. *See State v. Morales*, 2010-NMSC-026, ¶ 8, 148 N.M. 305, 236 P.3d 24 ("[A] statute is applied prospectively unless the legislature has made clear its intention to apply it retroactively."

investigatory detention violated Article II, Section 10 of the New Mexico Constitution and the evidence subsequently gained from the search of his person—the firearm—should have been suppressed. We agree Defendant was unlawfully seized and reverse.

**BACKGROUND**

**{2}** On September 12, 2020, at approximately 12:00 p.m., two police officers employed by the City of Clovis, New Mexico, Officers Smid and Bryant, were dispatched to a local laundromat to investigate a call regarding a suspicious person. The caller, a customer at the laundromat, reported that a man later identified as Defendant was seated in the passenger seat of a vehicle that was parked immediately adjacent to hers. The caller stated that Defendant watched her walk into the laundromat and then looked into her vehicle's windows once the caller was inside the building. Officer Smid also learned that the vehicle in which Defendant sat had a sun shade covering the entire front windshield and that Defendant and another person, later identified as Elizabeth Smith (Driver), who was seated in the driver's seat of her vehicle, had been there "quite a while." The caller reported that she was concerned for her safety if she returned to her vehicle and requested officer assistance.

**{3}** Upon arriving at the scene, Officer Smid entered a side door to the laundromat and confirmed the above information with laundromat staff and the caller. Officer Smid was then joined by Officer Bryant, and the two approached Defendant and Driver, who were still seated in Driver's vehicle, to investigate. Officer Smid walked around to the rear of Driver's vehicle, which still had its windshield completely covered by the sun shade. Officer Bryant approached from the front of the vehicle toward the passenger headlight. Defendant was seated in the passenger seat with the door partially ajar and his foot placed on the ground outside the vehicle. Driver was in the driver's seat, and the driver's door was completely shut. Approaching from the rear of the vehicle, Officer Smid walked up to the partially open passenger door, stated, "How're you all doing?" and fully opened the vehicle door with his right hand, standing in the vehicle's open doorway next to Defendant. Officer Bryant stood several feet away, on the other side of the now-fully open passenger door, near the headlights.

**{4}** Officer Smid asked Driver and Defendant, "What's going on?" and Driver responded by stating that they were getting ready to "do some laundry." Officer Smid then asked Driver and Defendant to provide him with identification. Both handed Officer Smid various forms of identification cards, and Officer Smid then moved around the back of the vehicle to the driver's door, which he opened to talk to Driver. Officer Bryant moved from the front of the vehicle around the passenger door and into the open passenger doorway where Officer Smid had been standing and remained there while Officer Smid questioned Driver. Defendant remained seated in the passenger seat.

**{5}** The encounter quickly transitioned into an investigation about various suspected drug- or alcohol-related offenses. Officer Smid testified at the suppression hearing that

(internal quotation marks and citation omitted)). All references to Section 30-7-16 in this opinion reference the 2020 version of the statute.

while standing outside the driver's side door, he saw a bottle of tequila in Driver's vehicle and what appeared to be a syringe sticking out of Defendant's left pocket. While talking with Driver, Officer Smid noticed a small piece of cloth that had blood on it stuck to her inner thigh. Officer Smid told Driver his belief that she had "just shot up." Officer Smid then learned from dispatch that Driver had an active arrest warrant in her name and that Defendant was on probation. Driver was removed from the vehicle and placed under arrest. Officer Smid noticed a pipe he suspected to be used for methamphetamine in an open backpack near Driver's feet on the vehicle's floorboard. Driver was then placed in the back of a patrol car, and Defendant was removed from the vehicle for suspected possession of drug paraphernalia.

**{6}** Defendant was placed in handcuffs, and Officer Smid began a brief search of Defendant's hands and clothing, during which Officer Smid discovered a small pistol in Defendant's hands. Defendant was subsequently charged and convicted of felon in possession of a firearm. *See* § 30-7-16(A)(1). Defendant appeals.

## DISCUSSION

**{7}** Defendant argues, among other things, that he was unlawfully seized under Article II, Section 10 of the New Mexico Constitution from the moment Officer Smid approached Driver's vehicle, fully opened the passenger door with his hand, and stood in the doorway next to Defendant. Defendant asserts that at that point in time he was seized, and the officers did not have reasonable suspicion to believe that a crime had been, or was being, committed. Because Defendant advances his claims under the state constitution, we examine the circumstances presented here only under Article II, Section 10 standards, applying federal precedent where applicable. *See State v. Simpson*, 2019-NMCA-029, ¶ 8, 446 P.3d 1160 (reviewing that case "on state constitutional grounds" but "applying the *Mendenhall* 'free-to-leave' test" (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

**{8}** A district court's denial of a defendant's motion to suppress evidence "presents a mixed question of fact and law." *State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183. We review the district court's supporting factual determinations with deference, determining only if they are supported by substantial evidence. *Id.* We review the relevant legal determinations de novo. *See id.*

**{9}** Article II, Section 10 protects persons suspected of criminal activity from "unreasonable searches and seizures." In *State v. Garcia*, 2009-NMSC-046, 147 N.M. 134, 217 P.3d 1032, our Supreme Court adopted "*Mendenhall's* reasonable person standard" for determining when a person is seized under Article II, Section 10. *See Garcia*, 2009-NMSC-046, ¶¶ 35-36; *see also Mendenhall*, 446 U.S. at 554. The standard generally provides that "a person has been seized only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Garcia*, 2009-NMSC-026, ¶ 37 (text only) (citation omitted). *Garcia* further explains that a person is not seized so long as they "remain[] free to disregard [an officer's] questions and walk away." *Id.* (internal quotation marks and

citation omitted). On the other hand, "[a]n otherwise consensual encounter becomes a seizure under the reasonable person standard when an officer engages in conduct significantly beyond that accepted in social intercourse." *Id.* ¶ 38 (internal quotation marks and citation omitted).

**{10}** "Possible indicators of a seizure" include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* ¶ 39. (internal quotation marks and citation omitted). *Garcia* summarizes the above principles by stating that when officers "convey a message that compliance with their requests is required, the reasonable person would not feel free to leave and a seizure has occurred." *Id.* (text only) (citation omitted).

**{11}** However, not all police encounters constitute seizures. *See Simpson*, 2019-NMCA-029, ¶ 8 ("The police do not need justification to approach a person and ask that person questions, so long as the actions of the officers do not convey a message that compliance with their requests is required." (internal quotation marks and citation omitted)). Ultimately, in determining whether a person was seized, "we evaluate (1) the circumstances surrounding the contact, including whether police used a show of authority; and (2) whether the circumstances of the contact reached such a level of accosting and restraint that a reasonable person would have believed he or she was not free to leave." *Id.* ¶ 9 (internal quotation marks and citation omitted).

**{12}** Once an encounter with police becomes nonconsensual—that is, the suspect does not reasonably feel free to leave—it becomes an investigatory detention that must be justified by, at a minimum, reasonable suspicion. *See State v. Williams*, 2006-NMCA-062, ¶ 11, 139 N.M. 578, 136 P.3d 579. Reasonable suspicion arises from a police officer's awareness of "specific articulable facts," particular to the individual detained, that when judged objectively "would lead a reasonable person to believe criminal activity occurred or was occurring." *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964 (internal quotation marks and citation omitted)); *see Williams*, 2006-NMCA-062, ¶ 23 (requiring individualized suspicion). This determination "is viewed from the perspective of what the officer knew at the time the officer detained a suspect." *State v. Aguilar*, 2021-NMCA-018, ¶ 16, 488 P.3d 698. While reasonable suspicion "can arise from wholly lawful conduct," it must be based on more than a mere hunch or unparticularized suspicion. *Urioste*, 2002-NMSC-023, ¶ 10 (internal quotation marks and citation omitted).

**{13}** In light of the above principles, we turn to the instant case. Generally, the threshold question we must answer is at what point during Defendant's encounter with police he became seized within the meaning of Article II, Section 10. *See Simpson*, 2019-NMCA-029, ¶ 6 ("The point at which the seizure occurs is pivotal because it determines the point in time the police must have reasonable suspicion to conduct an investigatory stop." (internal quotation marks and citation omitted)). Defendant asserts that he was seized from the moment Officer Smid approached Driver's vehicle and opened the passenger door because the officers' conduct, including their physical

presence in and around the doorway, "indicate[d] compliance was required," and a reasonable person would not have felt free to leave. The State argues that Defendant was seized when Officer Smid asked for Driver's and Defendant's identification cards, which we note was less than twenty seconds into the interaction. The district court did not make an express finding regarding when Defendant was seized, but did find that the stop was justified by reasonable suspicion from its inception.

**{14}** We conclude that even under the State's assertion regarding the moment Defendant was seized,[2] Officers Smid and Bryant lacked reasonable suspicion of criminal wrongdoing sufficient to justify an investigatory detention. As such, and although we express concern that Defendant may not have been free to leave when Officer Smid fully opened the vehicle door that Defendant had left ajar and stood next to Defendant in the vehicle's open doorway, we need not address whether Defendant was seized before Officer Smid asked for Defendant's identification. We explain.

**{15}** The State concedes that Defendant was seized a matter of seconds after the officers approached Driver's vehicle, when Officer Smid asked Defendant for identification. Assuming without deciding such to be the moment of seizure, we must determine whether reasonable suspicion developed at or before that point. We begin by noting that the officers lacked reasonable suspicion that any *crime* had been or was being committed when they approached Driver's vehicle. On approach, the officers knew what the caller had reported and what the laundromat staff had confirmed: that a suspicious male had watched the caller get out of her vehicle and enter the laundromat; that the male had looked into the caller's vehicle once she was inside the building; and that the two people in Driver's vehicle had been sitting there "a while."

**{16}** The State argues that these facts justify a belief that Defendant may have been involved in, or attempting to commit, larceny, auto burglary, loitering, or trespass. However, the record is completely devoid of specific articulable facts supporting a reasonable belief such was occurring. *Cf.* NMSA 1978, § 30-14-1(A) (1995) (stating the

---

2In making this concession, the State relies on a principle that is now of questionable legal viability. *See Williams*, 2006-NMCA-062, ¶ 16 (stating that "a passenger is not free to leave and refuse an officer's request for identification in the context of an ordinary traffic stop because the driver is not free to refuse an officer's request for identification and documentation" (citing *State v. Affsprung*, 2004-NMCA-038, ¶ 15, 135 N.M. 306, 87 P.3d 1088)). *Affsprung* has recently, and expressly, been overruled on this point, at least in regard to Fourth Amendment protections. *See State v. Vasquez-Salas*, 2023-NMSC-023, ¶ 18, 538 P.3d 40 (stating that *Affsprung's* holding "no longer comports with" either our Supreme Court's Fourth Amendment analysis or that of the Supreme Court of the United States). The *Vasquez-Salas* Court did expressly note, however, that "*Affsprung* was decided solely under the United States Constitution," and the Court did not "opine as to how the facts of that case would fare under the New Mexico Constitution." *Vasquez-Salas*, 2023-NMSC-023, ¶ 18. Thus, while we are without legal authority to embrace the State's conclusion as to when Defendant was seized, we rely on its concession and will not undertake to analyze the continued viability of *Affsprung* or *Williams* under Article II, Section 10 without the benefit of argument of counsel. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them. This creates a strain on judicial resources and a substantial risk of error. It is of no benefit either to the parties or to future litigants for this Court to promulgate case law based on our own speculation rather than the parties' carefully considered arguments." (citation omitted)).

requirements for criminal trespass, which include, in part, remaining on posted private property without the permission of the owner or controller of the land); *State v. Vasquez-Salas*, 2023-NMSC-023, ¶¶ 2, 23-24, 538 P.3d 40 (explaining that an officer's suspicion that a passenger in a vehicle had just committed a burglary was supported, in part, by observation of burglary tools in the vehicle). Indeed, Officer Smid testified that he did not believe any crime had been committed when he initially approached Driver's vehicle. While we remain cognizant that reasonable suspicion can develop from wholly innocent conduct, we must also adhere to the requirement that reasonable suspicion is based on specific articulable facts regarding potential "*criminal* activity." *See Urioste*, 2002-NMSC-023, ¶ 6 (emphasis added).

{17}  Here, simply looking at a person or into their vehicle is not a crime. Moreover, there is no evidence that Defendant and Driver had stayed in the parking lot after its owners—or in this case, laundromat staff—asked them to leave. *Cf.* § 30-14-1(A) (criminal trespass). The parking lot was ostensibly open to the public; the incident in question occurred at around 11:00 a.m. to 12:00 p.m. while the laundromat was open; and the officers did not testify that they had any suspicion of criminal activity before approaching the vehicle. Thus, the police did not have reasonable suspicion before making contact with Defendant.

{18}  While such may not have been required if the initial interaction was consensual—a question we need not answer today—the officers also did not develop reasonable suspicion before Officer Smid asked for Defendant's identification. After Officer Smid's initial question, he only asked one other—what Defendant and Driver were doing—before asking for their identification. According to Officer Smid's testimony at the suppression hearing, he learned no new facts supporting reasonable suspicion of Defendant before asking for his identification. Given the State's concession that Defendant was seized at that moment, we have no basis to conclude that the officers had reasonable suspicion supporting the seizure. Thus, the seizure of Defendant, and any evidence discovered thereafter, should have been suppressed. *See State v. Tapia*, 2018-NMSC-017, ¶ 13, 414 P.3d 332 ("The exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'" (text only) (citation omitted)). Defendant's conviction must therefore be vacated, and we need not address his other arguments on appeal. *Cf. State v. Gutierrez*, 2005-NMCA-015, ¶ 22, 136 N.M. 779, 105 P.3d 332 ("[C]onstitutional errors can only be considered harmless if we are able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." (internal quotation marks and citation omitted)).

**CONCLUSION**

{19}  For the reasons set forth, we reverse the district court's order denying Defendant's motion to suppress and remand with instructions to vacate his conviction.

{20}  **IT IS SO ORDERED.**

**J. MILES HANISEE, Judge**

**WE CONCUR:**

**ZACHARY A. IVES, Judge**

**GERALD E. BACA, Judge**